James E. Cecchi
Donald A. Ecklund
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Joseph E. White, III
Lester R. Hooker
Brandon T. Grzandziel
SAXENA WHITE P.A.
5200 Town Center Circle, Suite 601
Boca Raton, Florida 33486
(561) 394-3399

Richard A. Maniskas
Katharine Ryan
RYAN & MANISKAS, LLP
995 Old Eagle School Rd., St. 311
Wayne, Pennsylvania 19087
(484) 588-5516

*Lead Counsel for Lead Plaintiffs
and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ENZYMOTEC LTD. SECURITIES LITIGATION | Civ. Action No. 2:14-cv-5556 (MCA)(MAH) |

## AMENDED CLASS ACTION COMPLAINT FOR
## <u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. CLAIMS ASSERTED IN THIS COMPLAINT..................................................7

III. JURISDICTION AND VENUE ..........................................................................7

IV. CLAIMS UNDER THE EXCHANGE ACT .......................................................8

    A. The Exchange Act Parties.........................................................................8

        1. Lead Plaintiffs .................................................................................8

        2. Exchange Act Defendants ...............................................................9

            i. Enzymotec.............................................................................9

            ii. The Officer Defendants........................................................9

    B. Background And Nature Of The Fraud At Enzymotec .........................10

        1. Enzymotec's Nutrition Business....................................................10

        2. The Exchange Act Defendants Tout InFat As A Key Driver Of Enzymotec's Future Growth .....................................................15

        3. The Exchange Act Defendants Materially Misrepresented Enzymotec's Prospects For Continued Growth.........................................20

            i. Chinese Regulatory Changes Render Enzymotec's Statements Concerning Its Business Prospects False And Misleading.......................................................................21

            ii. Biostime's Price-Fixing Scandal And Operational Uncertainty Prior To The Class Period Would Have Also Alerted Enzymotec To Impending Problems................................26

        4. Through The SPO, The Exchange Act Defendants Personally Profited From Their Material Misrepresentations Concerning Enzymotec's Business Prospects ...........................................................28

    C. The Truth Emerges ..................................................................................30

    D. The Exchange Act Defendants' False And Misleading Statements And Omissions..................................................................................................40

1.      False Statements Regarding Guidance......................................................40

2.      False Statements Regarding Chinese Sales Of InFat................................44

3.      False Statements Regarding Chinese Regulations.....................................48

4.      False Statements Regarding Internal Controls..........................................51

V.     LOSS CAUSATION................................................................................................53

VI.    PRESUMPTION OF RELIANCE.........................................................................54

VII.   NO SAFE HARBOR.............................................................................................55

VIII.  CLAIMS FOR RELIEF BROUGHT PURSUANT TO THE EXCHANGE ACT ..........56

       COUNT I ...............................................................................................................56

       COUNT II ..............................................................................................................59

IX.    CLAIMS UNDER THE SECURITIES ACT ......................................................60

       A.     The Securities Act Parties..........................................................................61

              1.      Lead Plaintiffs.................................................................................61

              2.      Securities Act Defendants...............................................................61

                      i.      Enzymotec...........................................................................62

                      ii.     The Officer Defendants.......................................................62

                      iii.    The Director Defendants......................................................62

       B.     The Offering Documents Misstated Material Information ....................64

              1.      False And Misleading Statements In Connection With The IPO ..............64

              2.      False And Misleading Statements In Connection With The SPO ............66

X.     CLAIMS FOR RELIEF BROUGHT PURSUANT TO THE SECURITIES ACT..........68

       COUNT III..............................................................................................................68

       COUNT IV...............................................................................................................71

       COUNT V ...............................................................................................................72

XI.    CLASS ACTION ALLEGATIONS .....................................................................74

XII.   PRAYER FOR RELIEF ................................................................................................76

XIII.  JURY DEMAND .........................................................................................................77

## I.    __INTRODUCTION__[1]

1.      Enzymotec is a global supplier of lipid-based specialty nutritional and medical food products and solutions, with its two premier products being an infant formula ingredient called InFat and krill oil products for the Omega-3 fatty acid market.  These two products comprise the vast majority of Enzymotec's primary "Nutrition" business segment, which accounted for approximately 96% of the Company's overall revenues in 2012.  With regard to the Company's infant formula ingredient, the Company sold the majority of its InFat product in China, which was experiencing significant increases in demand for infant formula in recent years.  Based on this strong demand, InFat became a centerpiece of Enzymotec's operations, comprising approximately a third of the Company's Nutrition segment sales in 2012 and proving to be a very attractive portion of its business given its comparatively high margins.  Enzymotec's krill oil products also experienced significant gains leading up to the Class Period (as defined below), accounting for 49.8% of the Company's total net revenues in 2012 and 53.8% of Enzymotec's total net revenues in 2013.

---

[1] Lead Plaintiffs David R. Raabe, David E. Raabe and Yehuda L. Danon (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief are based on the independent investigation of their undersigned counsel.  This investigation includes review and analysis of (i) a review of public filings by Defendant Enzymotec, Ltd. ("Enzymotec" or the "Company") with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Enzymotec's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of Enzymotec common stock; (vii) consultations with relevant experts; and (viii) other material and data concerning the Company, as identified herein.  Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control, particularly since Defendants are primarily located in Israel and the operations at issue here primarily took place in Israel, Sweden and China.  Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

2.      Accordingly, the rapid advancement of sales in the Company's all-important Nutrition segment corresponded to significant increases in the Company's financial results leading up to the start of the Class Period.  Specifically, Enzymotec grew net revenues annually by 37% from 2009 to 2012 and by 85% in the first half of 2013 compared to the first half of 2012.  Against this backdrop of considerable operational growth, Enzymotec and its senior executives—including the Company's President and Chief Executive Officer, Ariel Katz, and its Vice President and Chief Financial Officer, Oren Bryan—represented to investors that Enzymotec was poised to continue its record of impressive financial results.  In turn, Defendants announced in August 2013 that they would effectuate an initial public offering ("IPO") of Enzymotec securities, which would be completed in November 2013.  In connection with the IPO and throughout the Class Period, Enzymotec touted the viability of its InFat business, stating that "InFat has been achieving rapid penetration in the Chinese and other Asian markets," and that the product offered "significant opportunities in other developing markets."  The Company further attributed a significant increase in the volume of InFat sales to "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market."

3.      In addition, Enzymotec emphasized the strength of its customer relationships within its overall nutrition business and the visibility that these relationships provide with regard to future sales, stating: "We have multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales."  Enzymotec was also bullish on its ability to add to its customer base in both InFat and krill, stating: "we expect to continue attracting new customers as the strong brand recognition of our existing key customers . . . in our Nutrition segment, builds consumer awareness of our premium products."

4.     On the strength of these and other representations, Enzymotec's IPO was a significant success.  All told, the Company issued 5,073,800 shares in the IPO at $14 per share for net proceeds of $63.5 million.  Enzymotec stated that it intended to use the net proceeds from the IPO to "meet its anticipated increased working capital requirements resulting <u>from the expected growth in the Company's business</u>."  Enzymotec shares began trading on September 27, 2013 following the commencement of the IPO, the first day of the Class Period.

5.     Following the IPO, Enzymotec continued to tout the growth in its nutrition business and the Company's prospects for future success.  For instance, on December 10, 2013, speaking at a Wedbush Securities conference, Defendant Katz touted Enzymotec's "very strong existing business growth" and the Company's ability to "<u>expan[d] the number of consumers</u> because [of] the unique value proposition that we bring."  Two months later on February 13, 2014, Enzymotec reported record financial results for the fourth quarter and full year 2013, with Katz stating in an earnings press release that, "[f]or fiscal year 2014, we believe <u>our revenue momentum will build sequentially throughout the year and enable us to report another record performance</u> . . . <u>Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position</u>."  In light of these and other statements, representations and omissions, Enzymotec's share price increased significantly, reaching a Class Period high of $33.44 per share on December 13, 2013.

6.     Contrary to the Company's representations, Enzymotec's insiders were well aware that the astronomical growth in the Company's InFat and krill sales leading up to the IPO and during the first part of the Class Period were unsustainable.  Specifically, the Chinese infant formula market—from which Enzymotec derived a large portion of its overall revenue through sales of InFat—was under a government-driven policy change announced prior to the IPO in

3

mid-2013, which would have a material and negative effect on the Company's future sales beginning in 2014. Despite these prevalent regulatory changes, Enzymotec falsely stated that it "<u>does not expect this change in Chinese regulations to impact its 2014 revenues</u>." Furthermore, given Enzymotec's representations concerning its multi-year contracts with customers and the resultant "<u>good visibility on sales</u>" that these relationships provided the Company, Enzymotec's insiders were also aware that the Chinese infant formula market was problematic, and that the Company's krill oil growth was dependent on orders from a single relatively new customer, all of which negatively affected its sales. Further compounding these issues were contractual disagreements that threatened to derail the Company's joint venture that produced InFat.

7. Despite these known factors and trends that alerted the Exchange Act Defendants to the impending downturn in Enzymotec's business, the Company's insiders sought to capitalize on the substantial increase in Enzymotec's share price following the IPO. To that end, on February 13, 2014—the same day that Katz stated his optimism concerning the Company's ability to deliver another record performance for 2014—Enzymotec announced a secondary public offering of stock (the "SPO" and together with the IPO, the "Offerings"). In contrast to the IPO, none of the proceeds from the SPO would go to the Company; instead, <u>all of the proceeds from the SPO would go to selling shareholders</u>. Two weeks later, the SPO pricing was set at $28.00 per share—or double the IPO per-share price of $14.00 per share—and existing shareholders would sell over 5.4 million shares for proceeds of over $150 million. In total, through the SPO, which was completed on March 5, 2014, Enzymotec insiders, including Defendants Katz and Bryan, as well as several other officers and directors, sold 1.94 million shares for gross proceeds of approximately $54.3 million, <u>which represented 58% of the shares that these insiders collectively owned at the time</u>:

### Enzymotec - Insider Participation in the Secondary

| Officers and Directors | | Shares Beneficially Owned: | | Total Shares Sold | % of Shares Sold | Gross Proceeds |
|---|---|---|---|---|---|---|
| | | Prior to Offering | After the Offering | | | |
| Katz | President/CEO | 658,172 | 455,106 | 233,526 | 35% | $6,538,728 |
| Bryan | VP/CFO | 124,100 | 79,055 | 51,802 | 42% | $1,450,456 |
| Doppelt | Vice Chairman | 90,780 | 29,295 | 70,708 | 78% | $1,979,824 |
| Belzer | Director | 1,976,080 | 746,804 | 1,413,667 | 72% | $39,582,676 |
| Pekelman | Director | 26,180 | 16,948 | 10,617 | 41% | $297,276 |
| BenDror | VP: Process Dev. | 145,180 | 100,387 | 51,512 | 35% | $1,442,336 |
| Cohen | Ex-Employee | 102,000 | 70,530 | 36,190 | 35% | $1,013,320 |
| Kahane | Business Dev. | 81,600 | 56,425 | 28,951 | 35% | $810,628 |
| Twito | COO | 81,600 | 56,425 | 28,951 | 35% | $810,628 |
| Zamir | Ex-Employee | 35,700 | 23,112 | 14,476 | 41% | $405,328 |
| **Total** | | **3,321,392** | **1,634,087** | **1,940,400** | **58%** | **$54,331,200** |

8.     The truth concerning Enzymotec's business was belatedly revealed to the market in piecemeal fashion starting just two months after the close of the suspiciously-timed SPO.  On May 14, 2014, in Enzymotec's press release announcing financial results for the first quarter of 2014, the Company disclosed for the first time that it was having issues with its business operations in China, stating that Chinese regulations required that the Company make certain changes to its production chain in connection with its infant formula manufacturing operations. On this news, the Company's share price dropped $6.48 per share on May 14, 2014 to close at $13.75 per share, a one-day decline of over 32% on heavy trading volume.  Enzymotec's share price remained artificially inflated, however, as the Company failed to disclose the full extent of its issues in China and the impact that these issues would have on its future performance.

9.     The full truth regarding the Company's business finally emerged on August 5, 2014, when the Company issued its press release announcing disastrous financial results for the second quarter of 2014.  Enzymotec's overall revenue declined 40%, with sales in the Nutrition

segment of the Company's business decreasing by 46%.  The Company's reported earnings were substantially lower than what investors were anticipating based on the Company's previous representations.  Enzymotec further stated that the Nutrition segment sales decrease was due to lower InFat sales in China resulting from new government regulations, which impacted supply and production, as well as increased price pressure and competition in the region, along with decreased krill sales volume.  Enzymotec also slashed the Company's guidance for 2014 by as much as 55%, which it initially provided only months earlier in connection with the announcement of the SPO:

### Full Year 2014 Guidance
(mm except for diluted EPS)

|  | 02/13/14 | 05/14/14 | 08/05/14 | Mid-Point Change |
|---|---|---|---|---|
| Net Revenue (Consolidation Method) | $110 – $120 | $90 – $110 | $62 – $70 | -43% |
| Net Revenue (Equity Method) | $88 – $95 | $68 – $85 | $46 – $52 | -46% |
| Non-Gaap Net Income | $18 – $22 | $15 – $22 | $8 – $10 | -55% |
| Non-GAAP diluted EPS | $0.77 – $0.94 | $0.64 – $0.94 | $0.34 – $0.43 | -55% |

10.     The extent of Enzymotec's issues shocked the market as the Company's stock declined $5.85 per share, or nearly 40%, on August 5, 2014 to close at $9.11 per share, on heavy trading volume.   Analysts downgraded Enzymotec's stock, with commentators stating that "Enzymotec's Q2 report was disastrous" and that the Company's results "were much worse" than expected.  Enzymotec's stock price declines in response to the Company's corrective disclosures in May and August 2014 wiped out hundreds of millions of dollars in market capitalization.  All told, Defendants' violations of the federal securities laws caused substantial damages to investors who purchased Enzymotec's securities at artificially-inflated prices during the Class Period and pursuant and/or traceable to Enzymotec's Offerings.

## II.   <u>CLAIMS ASSERTED IN THIS COMPLAINT</u>

11.   Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Enzymotec and the Officer Defendants on behalf of purchasers of the Company's common stock during the Class Period between September 27, 2013 and August 4, 2014, inclusive.  Lead Plaintiffs also assert control-person claims under Section 20(a) of the Exchange Act against the Officer Defendants.

12.   Lead Plaintiffs' second set of claims asserts a series of strict-liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for materially untrue statements and misleading omissions made in connection with Enzymotec's Offerings.  The Securities Act claims are addressed in Section IX of this Complaint.

## III.   <u>JURISDICTION AND VENUE</u>

13.   The claims asserted herein arise under (i) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5); and (ii) Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

14.   This Court has jurisdiction of the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v); and 28 U.S.C. § 1331 and 1337.

15.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Enzymotec maintained corporate offices in this District throughout the Class Period.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities market.

**IV.     CLAIMS UNDER THE EXCHANGE ACT**

**A.     The Exchange Act Parties**

**1.     Lead Plaintiffs**

17.     Lead Plaintiff David R. Raabe, as set forth in Mr. Raabe's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On February 13, 2015, the Court appointed David R. Raabe as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

18.     Lead Plaintiff David E. Raabe, as set forth in Mr. Raabe's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On February 13, 2015, the Court appointed David E. Raabe as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

19.     Lead Plaintiff Yehuda L. Danon, as set forth in Mr. Danon's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On February 13, 2015, the Court appointed Yehuda L. Danon as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

2.      **Exchange Act Defendants**

i.      **Enzymotec**

20.      Enzymotec is a global supplier of specialty lipid-based products and solutions maintains offices at 55 Madison Avenue, Suite 400, Morristown, NJ 07960.  The Company was founded in 1998 and is an Israeli limited public company with its principal executive offices located at Migdal Ha'Emeq, Israel.   The Company's wholly-owned subsidiaries include Enzymotec USA, Inc. and VAYA Pharma, Inc.  Enzymotec also participates in a joint venture with Sweden-based AarhusKarlshamn AB ("AAK"), wherein Enzymotec owns 50% of Advanced Lipids, AB ("AL"), a Swedish company.  Through this joint venture, the Company markets and sells InFat, its infant formula ingredient product used in the baby formula business.

21.      On September 27, 2013, Enzymotec went public via its IPO on the NASDAQ Global Select Market ("NASDAQ"), in which the Company sold over 5 million shares at $14 per share, raising over $63 million in net proceeds.  On February 28, 2014, Enzymotec completed its SPO, in which certain Company insiders sold an aggregate 5.4 million shares at $28 a share for proceeds of over $150 million.  Enzymotec's common stock trades on the NASDAQ under the symbol "ENZY."

ii.      **The Officer Defendants**

22.      Defendant Ariel Katz ("Katz") has been President and Chief Executive Officer of Enzymotec since August 2000.[2]  He also serves as head of the VAYA Pharma segment.  Katz participated in the Enzymotec SPO and sold 35% of his shares for proceeds of approximately $6.5 million.  At all relevant times during the Class Period, Katz served as CEO and signed or

---

[2] During the June 5, 2014 Jefferies 2014 Global Healthcare Conference, Katz stated that "We are an independent company.  I joined the company in 2001, when we have been basically three employees, one room.  And since then, we developed all the company . . . ."

9

authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.  Katz spoke on behalf of Enzymotec on analyst and investor conference calls and to the press, and signed Forms F-1 and 20-F filed with the SEC by Enzymotec.

23.     Defendant Oren Bryan ("Bryan") has been Vice President and Chief Financial Officer of Enzymotec since June 2008.  Bryan participated in the Enzymotec SPO and sold 42% of his shares for proceeds of approximately $1.4 million.  At all relevant times during the Class Period, Bryan served as CFO of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.  Bryan spoke on behalf of Enzymotec on analyst and investor conference calls and to the press, and signed Forms F-1, 6-K and 20-F filed with the SEC by Enzymotec.

24.     Defendants Katz and Bryan are collectively referred to hereinafter as the "Officer Defendants."

25.     The Officer Defendants and Enzymotec are collectively referred to herein as the "Exchange Act Defendants."

      **B.**      **Background And Nature Of The Fraud At Enzymotec**

          **1.**      **Enzymotec's Nutrition Business**

26.     Enzymotec is a global supplier of specialty lipid-based consumer nutritional products and solutions.  Lipids are a major structural component of all life and are essential for cell structure and biological functions, including energy storage and cell signaling.  Enzymotec has two main business segments: Nutrition, which includes nutritional ingredient products based on lipids; and VAYA Pharma, which includes branded, prescription-only medical foods for patients with conditions requiring specific nutrient requirements.  The Company's financial results were fueled almost exclusively by the Nutrition segment, which represented 96% of

Enzymotec's net revenues in 2012 and featured two main product categories: infant nutrition products and krill oil products.  In Enzymotec's Class Period SEC filings, the Company represented itself as "a rapidly growing and profitable nutritional ingredients and medical foods company."

27.     Enzymotec uses proprietary technologies to identify appropriate lipid-modifying enzymes and then improve the activity of these enzymes to enhance their efficiency, stability and recyclability, as well as to enable their use in organic media.  These enhanced enzymes are then utilized to restructure lipids found in natural sources including krill, fish, vegetable sources and bovine milk.  The Company then transforms the lipids from these raw materials into lipids that are familiar to the human body but cannot be extracted efficiently or in sufficient yield, are not provided in sufficient amounts through normal dietary intake or cannot otherwise be manufactured.

28.     As of December 2013, Enzymotec only had 14 products, all of which, Defendant Katz described, the Company had internally developed "from the idea . . . level."[3]  Katz often touted the Enzymotec's unique place among nutritional and supplement producers, stating that the Company is:

> [F]ully integrated.  There are not many companies in our size that are fully integrated and we are a fully integrated company.  We have everything under one umbrella.  We are not outsourced.  We have the lipid technology, we have the R&D, we have the enzymatic technologies, we have the process development, the manufacturing, and the consumer and customer sales and marketing.  We call every day to 200 customers.  It could be doctors or it could be blended companies.

29.     A centerpiece of Enzymotec's Nutrition business is InFat, the Company's infant formula ingredient product, which represented 35.8% of its total segment net revenues in 2012.  The Company produces InFat by modifying the molecular structure of vegetable oils to create an

---

[3] December 10, 2013 Wedbush Securities California Dreamin' Consumer Conference.

ingredient that more closely resembles a key component of human breast milk that is known to facilitate healthy infant development.  Enzymotec's IPO Offering Documents[4] touted InFat as a close substitute to the "gold standard" of infant nutrition—human breast milk fat—and characterized InFat as "<u>the most significant development to infant formula ingredients since DHA and ARA were introduced to the market almost 15 years ago</u>."  The IPO Offering Documents further stated that Enzymotec's "next generation" of infant formula ingredient products targets additional attributes of key lipids found in human breast milk.

30.    Enzymotec markets and sells InFat through AL, a joint venture with Sweden-based AAK.  The AL joint venture was established to provide "a Swedish specialty fat company based on Enzymotec's advanced and unique research and AAK's international strength within development, production and marketing of specialty fats."[5]  Enzymotec has a 50% interest in the joint venture.  All of the revenues from sales of InFat products are derived from sales by AL.  Under the joint venture arrangement with AAK, Enzymotec and AAK are each responsible for particular functions related to the production, marketing and sale of the final InFat product.[6]  In

---

[4] Enzymotec's IPO Offering Documents include: Form DRS Draft Registration Statement, filed with the SEC on July 10, 2013; Form DRS/A Amended DRS, filed with the SEC on August 14, 2013; Form F-1 Foreign Issuer Registration Statement, filed with the SEC on August 22, 2013; Form F-1/A Amendment No. 1 IPO Prospectus, filed with the SEC on September 16, 2013; Form 8-A12B Registration Statement, filed with the SEC on September 17, 2013; Form F-1/A Amendment No. 2 IPO Prospectus, filed with the SEC on September 24, 2013; Form POS AM Post-Effective Amendment No. 1 to Form F-1, filed with the SEC on September 27, 2013; and Form 424B4 IPO Prospectus, filed with the SEC on September 30, 2013.

[5] *Id*.

[6] Under the joint venture, the breakdown of each joint venture partner's responsibilities is as follows:

> We manufacture enzymes that we supply to AAK, which then produces the final InFat product at its dedicated facility in Sweden using those enzymes together with other raw materials that AAK is responsible for sourcing. AAK is also responsible for all labor and other costs of production, including freight and logistics, as well as for capital expenditures for increased capacity, inventory

particular, Enzymotec is responsible for research and development, business development and marketing, and AAK is responsible for the production, management of inventory and logistics relating to the actual sales and delivery of the InFat product.  AL then sells the final good to companies who use InFat in the production of their own infant formula.  Production of InFat occurs at a dedicated facility in Karlshamn, Sweden.

31.     As the Company stated in its IPO Offering Documents, China is the largest market for nutrition products containing InFat, and sales of the Company's infant formula products were the strongest in China.  Specifically, approximately 89% of sales for Enzymotec's infant nutrition segment come in Asia and primarily China.  Enzymotec's largest InFat purchaser is Biostime, a Hong Kong-based manufacturer of premium pediatric nutrition and baby care products.  According to the IPO Registration Statement, sales of InFat attributable to sales in China by and under the brand name of Biostime accounted for between 10% to 12% of the Company's consolidated net revenues in 2012.   In addition to Biostime, Enzymotec has relationships with several dozen infant formula companies and is incorporated into approximately 50 different brands.

32.     Enzymotec's other main product is krill oil, which is used in supplements and nutritional products to provide omega-3 fatty acids.  Krill are small crustaceans found in two primary ocean regions: the Southern Ocean and the North Pacific Ocean.  The Company produces krill oil by sourcing raw krill meal and then extracting krill oil therefrom.  Enzymotec purportedly sells its krill oil to "companies that manufacture and market dietary supplements and to distributors of these ingredients and products."   According to an October 22, 2013 Wells

---

storage and management, receivables collection and product liability insurance. We are responsible for research and development, as well as business development (including penetration of new markets) and marketing activities.

See Form 424B4 IPO Prospectus, filed with the SEC on September 30, 2013 at 53.

Fargo analyst report, the Company is "the second-largest krill oil supplier (market share of 30% and 80% of divisional sales)."[7]

33.     According to the IPO Offering Documents, the Company was expanding its "Migdal Ha'Emeq manufacturing facility and equipping it to enable us to extract krill oil ourselves using technologically advanced equipment and processes."  The completion of the Migdal Ha'Emeq manufacturing facility expansion and a successful operating run of the new krill oil extraction process was announced in Enzymotec's January 13, 2014 press release.  The expansion was "expected to improve the company's gross margin by increasing sales and lowering manufacturing costs."[8]

34.     The Company's krill oil products similarly experienced substantial growth prior to and during the Class Period, accounting for 49.8% of the Company's total net revenues in 2012 and 53.8% of Enzymotec's total new revenues in 2013.  As Enzymotec touted, the Company grew to become the world's number two provider of krill during the Class Period.[9]

35.     Accordingly, given the prominence of Enzymotec's Nutrition segment to the Company's bottom line, the Company's ability to continue and grow InFat sales in China, and in particular through its sales to Biostime, as well as the Company's continued growth in krill oil sales, were of utmost importance to maintaining Enzymotec's overall financial results.

---

[7] ENZY: Initiating Coverage With An Outperform Rating Food's Newest Health & Wellness Growth Opportunity, Wells Fargo (Oct. 22, 2013).

[8] Lior Ronen, Enzymotec Had A Great 2013, And Has A Promising Year Ahead, Seeking Alpha (Feb. 18, 2014), http://seekingalpha.com/article/2027341-enzymotec-had-a-great-2013-and-has-a-promising-year-ahead (last visited May 13, 2015).

[9] Enzymotec experienced over 100% sales growth in the U.S. in 2013.  The Company had approximately $18 million in net revenue in the U.S. in 2012, which jumped to $35.5 million in 2013 as Enzymotec went public.  Accordingly to the SPO Prospectus, "[a]pproximately $9.2 million of the increase in sales of krill products was from one customer in the United States that placed initial orders with [the Company] in 2012 and significantly increased those orders in 2013."

However, as discussed in further detail below, Defendants failed to disclose to investors that Enzymotec's Nutrition segment was on unstable ground and that the rapid growth recorded prior to and during the first part of the Class Period was unsustainable.

> **2.     The Exchange Act Defendants Tout InFat As A Key Driver Of Enzymotec's Future Growth**

36.     In the Company's IPO Offering Documents, Enzymotec stated that it had grown net revenues by a compounded annual growth rate of 37% from 2009 to 2012, and grew net revenues by 85% in the first half of 2013 compared to the first half of 2012.  Notably, the IPO Offering Documents emphasized that InFat had been "achieving rapid penetration in the Chinese and other Asian markets," with "significant opportunities in other developing markets."  The Company further attributed a significant increase in the volume of InFat sales to "increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market."  The IPO Offering Documents cited statistics concerning expected growth in the infant nutrition market of 10.5% from 2012 to 2017 according to "industry sources," and represented that Enzymotec's "infant nutrition products have the potential to outpace this industry growth as they replace conventional vegetable oils traditionally used in most infant formula."

37.     In the IPO Offering Documents, Enzymotec further emphasized the strength of the Company's customer relationships with leading infant nutrition companies and the visibility that these relationships provide with regard to future sales, stating: "We have multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales." Enzymotec further stated: "we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime . . . in our Nutrition segment, builds consumer awareness of our premium products."

15

38.     Fueled by the strength of its financial results prior to the start of the Class Period and the representations concerning Enzymotec's expected future growth in the IPO Offering Documents, on September 26, 2013, the Company issued a press release announcing that the IPO would include an offering of 4,412,000 shares at a price of $14 per share, with an underwriter option to purchase 661,800 additional shares.  Enzymotec stated that it intended to use the net proceeds from the IPO to "meet its anticipated increased working capital requirements resulting from the expected growth in the Company's business."  Enzymotec's shares began trading on September 27, 2013, closing at $18.16, significantly above the IPO price.  Enzymotec completed the IPO in October 2013, and all told, the Company issued 5,073,800 shares at $14 per share for net proceeds of $63.5 million.

40.     The market responded favorably to Enzymotec's representations concerning its business prospects, with analysts citing the Company's publicized growth figures and statements concerning the viability of InFat.  For example, on October 22, 2013, Wedbush Securities ("Wedbush") published a report entitled "Enzymotec's Formula To Success," wherein Wedbush initiated coverage of Enzymotec with an Outperform rating and a 12-month $21 price target.  In the report, Wedbush reiterated the Company's statements concerning InFat, including that the product "is rapidly being adopted by leading formula companies, especially in China," that "the Chinese [infant-nutrition] market is projected to grow at an even higher 17.5% rate" as compared to a 9.5% global rate, and that "Enzymotec is quickly adding new customers, which should enable the company to grow much faster than the industry."  Given Enzymotec's representations concerning its infant formula business, the Wedbush report stated, "we expect infant nutrition to be the fastest growing portion of the business going forward."

41.     Another October 22, 2013 analyst report issued by Wells Fargo Securities provided similar sentiments, placing an Outperform rating on the Company and stating that Enzymotec "is building a strong framework from which to support robust long-term growth." On the same date, Canaccord | Genuity issued a report placing a Buy rating and a $24 price target on the Company, stating that "Enzymotec remains well positioned (~90% of InFat end-customer sales in Asia) to participate in the high-growth geographies of the market, particularly China."

42.     Following the IPO, Enzymotec continued to post impressive financial results that purportedly boded well for continued growth and prosperity.  For instance, on November 11, 2013, the Company issued record results for the third quarter of 2013, including a 66.3% increase in net revenues and an 87.5% increase in net income.  In connection with these results, Defendant Katz stated that Enzymotec's "top line performance was driven by robust performance," including a growth of 68.9% year-over-year in Nutrition.

43.     The market responded favorably to these representations and financial results, with the Company's stock price increasing $1.36, or 6.2%, from a close of $21.93 on November 8, 2013 to a close of $23.29 on November 11, 2013.  Analysts also responded favorably to Enzymotec's results.  For instance, in a November 11, 2013 report, Jefferies raised its price target for the Company $6 to $25, and stated its expectations that "InFat should outpace industry growth of ~9% through 2018 from substitution and penetration in premium and mid-range products (mostly China)."  Also on November 11, 2013, Wedbush issued a report that raised its price target for the Company's stock to $27, stating that "expanded customer relationships for InFat lipid ingredient drives growth in the core Nutrition segment," and noted that this expansion was occurring "especially in the fast-growing Chinese market."

44.     On this same date, Wells Fargo issued a report in which it stated: "We continue to see strong prospects for ENZY's InFat infant formula compound and particularly as more limited formula industry pricing opportunities in China heighten the importance of downstream manufacturers delivering science-backed nutrition to support mix opportunities."  On November 12, 2013, Canaccord | Genuity issued a report in which it reiterated its Buy rating and raised its price target to $27, stating that "Enzymotec is well positioned to drive sustained growth in the highly attractive nutrition market, translating into strong sales, margin and earnings momentum."

45.     A month after Enzymotec's November earnings release, the Exchange Act Defendants continued to hype to investors the Company's expected future financial growth.  For instance, on December 10, 2013, speaking at a Wedbush Securities conference, Defendant Katz emphasized Enzymotec's "very strong existing business growth" and the Company's prospects for future improvements based on its ability to "expan[d] the number of consumers because [of] the unique value proposition that we bring."   Enzymotec's share price continued to soar, reaching a Class-Period high of $33.44 only three days later on December 13, 2013.

46.     A December 19, 2013 Wells Fargo report stated that a meeting with Defendant Katz "reinforce[d]" that the Company's infant nutrition business presented "growth opportunities":

> We recently met with CEO Ariel Katz and came away confident in Enzymotec's multi-year growth opportunity. We continue to view Enzymotec as uniquely positioned to benefit, via its SN-2 palmitate compound, from the growing demand for functional infant nutrition ingredients. . . Net, we believe that ENZY's two primary value creators, infant nutrition and medical foods optionality, are intact.

47.     On February 13, 2014—a mere two weeks prior to the SPO—Enzymotec reported impressive financial results for the fourth quarter and full year 2013, including 59% and 72% increases in quarterly and annual net revenues, respectively; and 57% and 138% increases in quarterly and annual net income, respectively.  Commenting on the financial results, Defendant

Katz stated: "For fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance."  Katz further provided: "Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position."

48.     Notably, in the February 13, 2014 earnings release, Enzymotec provided robust guidance ranges for its full fiscal year 2014, including:

   (a)     "Net revenues, based on the equity method of accounting, of $88 million to $95 million, an increase of 35% to 46%";

   (b)     "Net revenues, based on the proportionate consolidation method, of $110 million to $120 million, an increase of 36% to 49%";

   (c)     "Non-GAAP net income of $18 million to $22 million, an increase of 31% to 60%"; and

   (d)     "Non-GAAP diluted EPS of $0.77 to $0.94."

49.     In the earnings release, the Company further stated that it "expects net revenues to continue to grow on a sequential basis throughout the year."

50.     On the same day that Enzymotec released its record financial results for the fourth quarter and fiscal year 2014, as well as the guidance described above, the Company also filed documents with the SEC for the SPO, in which selling shareholders would sell over 5.4 million shares of Enzymotec stock for proceeds of over $150 million.

51.     Analysts responded favorably to Enzymotec's record performance and its robust guidance.  For instance, a February 19, 2014 Wedbush report maintained an Outperform rating on the Company and noted with approval the guidance that Enzymotec management provided: "Management provided initial 2014 guidance for revenue of $88-95 million (or 35-46% growth), consistent with current consensus of $93 million, but EPS guidance of $0.77-0.94 exceeds the current consensus estimate of $0.76."  The Wedbush report also highlighted the performance of

the Company's InFat product: "Enzymotec posted above-expected Q4 gross margin of 58.4%, up 540 bps, <u>driven primarily by a positive mix shift to higher-margin sales of the InFat lipid ingredient for infant formula</u> . . ."

52.     On February 25, 2014, Wells Fargo issued a report in response to Enzymotec's earnings that also highlighted the Company's bullish outlook.  In its report, Wells Fargo maintained an Outperform rating on Enzymotec's stock and "rais[ed] 2014 EPS to $0.92 from $0.75," which was based on management's "prospects for stronger sales and margins."  The report further stated that, "<u>[c]onsistent with management's view, we anticipate that increased capacity for InFat will support sequential revenue acceleration during H2 2014</u> . . ."  A March 3, 2014 Canaccord | Genuity report noted that "[n]early all significant metrics exceeded our forecast" for the Company,  reiterated a "Buy" rating for the Company and "rais[ed] estimates following stronger Q4 results <u>and favorable guidance</u>."

### 3.     The Exchange Act Defendants Materially Misrepresented Enzymotec's Prospects For Continued Growth

53.     Contrary to Enzymotec's representations during the Class Period concerning the Company's prospects for continued growth in its financial results, the Exchange Act Defendants were well-aware from the start of the Class Period that Enzymotec was facing formidable hurdles in order to duplicate the astronomical growth in the Company's InFat sales that had fueled its increasing financial results leading up to the IPO and in the first few quarters of Enzymotec's history as a publicly-traded company.

54.     Specifically, the Company's insiders knew that the Chinese infant formula-market was facing a significant change in government regulations that would materially hinder Enzymotec's crucial Chinese InFat sales beginning in 2014.  In addition, the Company's insiders knew, based on their "good visibility on sales" derived from Enzymotec's multi-year contracts

with its customers, that the Chinese infant formula market was saturated and oversupplied, which would also have negative consequences to the Company's bottom line.  The confluence of these two factors created an impending downturn in Enzymotec's critical infant nutrition segment, of which the Officer Defendants were well-aware.[10]

### i.   Chinese Regulatory Changes Render Enzymotec's Statements Concerning Its Business Prospects False And Misleading

55.     Leading up to the start of the Class Period, the Chinese infant formula market had experienced a turbulent history that fueled demand for imported, as opposed to domestic, infant formula.  By way of background, in 2008, Chinese regulators discovered that local infant formula businesses had been adding a toxic chemical, melamine, to their infant formulas.[11]  At least six infants died and hundreds of thousands more were injured because of the tainted formula. Nineteen people were imprisoned (including three life sentences) and two were executed.[12]  Local businesses became stigmatized and the demand for foreign imported infant formula skyrocketed.  Soon, Chinese demand for imported infant formula exceeded supply and upstart businesses and opportunists began devising creative ways to profit from the infant formula gold rush.  Some people began smuggling infant formula from Hong Kong and other

---

[10] To explain and detail the foreseeable nature of the impact that the Chinese regulation changes would have on the infant formula market in China, and the resulting negative effects such regulation changes would have on Enzymotec's business, Lead Plaintiffs provide the expert opinion of Dr. Mingruo Guo, attached as Exhibit A (the "Guo Declaration"), who is a Food Scientist with a Ph.D. in Food Chemistry, a Professor in the Department of Nutrition and Food Sciences in the College of Agricultural and Life Sciences at the University of Vermont, and who has published and spoken regularly on a full range of topics related to functional foods and milk-based infant formulas.

[11]  *See* Yanzhong Huang, The 2008 Milk Scandal Revisited, Forbes (July 16, 2014), http://www.forbes.com/sites/yanzhonghuang/2014/07/16/the-2008-milk-scandal-revisited/.

[12] *The New York Times*, 2 Executed in China for Selling Tainted Milk (November 24, 2009), http://www.nytimes.com/2009/11/25/world/asia/25china.html?_r=0.

parts of the world, while others engaged in business practices that included rebranding local products to appear like imports.[13]

56.     In 2013, another scandal rocked the infant formula industry when Chinese regulators revealed that foreign businesses had participated in infant formula price-fixing.[14]  The cumulative effect of these issues caused Chinese officials to take action to resolve its problematic infant formula market.  In May 2013, a popular Chinese news outlet, Xinhuanet, published an article that highlighted Premier Li Keqiang's intent to increase government oversight of the infant formula industry in order to "upgrade the safety standard of domestic baby milk powder."[15]  The article quoted a statement released after a meeting of China's cabinet which read: "Baby milk powder safety is not only an issue concerning people's livelihood, but also a major economic and social issue affecting the nation's future.  It is urgent for the government to upgrade the safety standard of domestic baby milk powder."  The article further noted that according to the Cabinet plan, the "government will tighten supervision of baby milk powder quality in accordance with the same standards used for drugs by applying drug electronic supervision codes to monitor each step of the production process of the powder."

57.     On August 2, 2013, China announced newly proposed infant formula regulations drafted to increase restrictions of foreign imports and to strengthen domestic markets.[16]

---

[13]  *See* Edward Wong, <u>Chinese Search for Infant Formula Goes Global</u>, NY Times (July 25, 2013),   http://www.nytimes.com/2013/07/26/world/asia/chinas-search-for-infant-formula-goes-global.html?_r=0.

[14]  *See id.*

[15]  *See* <u>Chinese Premier Vows to Boost Dairy Industry</u>, Xinhuanet (May 31, 2013), http://news.xinhuanet.com/english/china/2013-05/31/c_132423178.htm.

[16]  *See* <u>China Consults On Tighter Infant Formula Regulations</u>, Xinhuanet (August 6, 2013), http://news.xinhuanet.com/english/china/2013-08/06/c_132607725.htm.;   China   Strengthens Control   Over   Infant   Formula   Productions,   Lexology   (August   21,   2013), http://www.lexology.com/library/detail. aspx?g=89dbfe57d45845789d47757f13212a7d.

Specifically, the proposed regulations would; (1) increase registration requirements for infant formula businesses, (2) tighten restrictions on the production, branding, and importation of infant formula products, and (3) impose greater liability on infant formula businesses.[17]  That same month, Enzymotec launched its IPO.  The proposed legislation was enacted in November and December of 2013.

58.     On November 27, 2013, the China Food and Drug Administration ("CFDA") announced Order No. 43 "to ban entrustment and OEM production, or repackaging of infant formula milk powder," which became effective on the announcement date.  Order No. 43 included the following guidance over the production of infant formula:

1.      Infant formula milk powder processing plants should not accept entrustments of other organizations or individuals to produce infant formula milk powder for them. Organizations or individuals should not entrust plants to produce infant formula milk powder by contracts or agreements.

2.      Plants should not produce infant formula milk powder for other brand owners or agents, or fraudulently use other brands.

3.      Plants should not produce infant formula milk powder in China, if plants registered their trademarks, company names and addresses for infant formula milk powder production outside of China.

4.      Any organization or individual should not purchase infant formula milk powder and directly refill into tanks, bags and boxes or change the original packaging and labeling.

5.      Plants should not produce infant formula milk powder in different product names by using the same ingredients from the same raw and auxiliary materials.

6.      Plants should only use cow milk, sheep/goat milk or dairy products (including milk protein, lactose, etc.) to produce infant formula.

7.      Violators will be investigated and handled by the Health and Family Planning Commission at county levels and above. Suspected criminals will be sent to the judicial system for a criminal sentence.

---

[17] China's 2013 Dairy Regulations, GAIN Rep. No. 14006 (2014).

59.     Also on November 27, 2013, the CFDA announced Order No. 44 regarding the supervision and inspection of infant formula milk powder processing plants, which required plants to implement additional procedures by May 31, 2014.  On December 25, 2013, the CFDA announced a revision to the verification process of infant formula milk powder processing plants, which stressed plant responsibilities for quality and safety control, as well as government oversight of such plants.[18]  To heighten product inspection, raw material quality, safety control and manufacturing, formula makers would be required to take on primary liability for their products' safety, ensure product traceability and implement a product-recall system.[19]  Pursuant to these Orders, all infant formula milk powder producers must have completed a permit verification process by May 31, 2014.

60.     Accordingly, leading up the IPO and throughout the Class Period, the Exchange Act Defendants were well-aware that the CFDA and other Chinese regulators were implementing extensive new regulations over the Chinese infant formula market.  These regulations stood to create significant changes to the infant formula production process in China and would have a dramatic effect on Chinese infant formula sales, which were a centerpiece of Enzymotec's business operations.  These regulatory changes posed a significant and foreseeable threat to the profitability of InFat, which represented a significant portion of the Company's revenue.

---

[18] *See* Ryan R. Scott and Zhang Jianping, China's 2013 Dairy Regulations, USDA (Feb. 20, 2014),http://gain.fas.usda.gov/Recent%20GAIN%20Publications/China%27s%202013%20Dairy%20Regulations_Beijing_China%20-%20Peoples%20Republic%20of_2-10-2014.pdf     (last visited May 12, 2015).

[19] Laurie Burkitt, China to Strengthen Infant-Formula Regulations, The Wall Street Journal (Dec. 25, 2013)  http://www.wsj.com/articles/SB10001424052702304753504579279792334738168 (last visited May 12, 2015).

61.   In fact, the Guo Declaration provides the following conclusions concerning Enzymotec's failures to properly account for and adequately disclose the fall-out of the changes in Chinese regulations to the Company's Chinese InFat business:

> In my opinion, the Chinese government regulatory changes to the infant formula market in China were publicized to the companies participating in the industry and the effects of the regulatory changes were foreseeable. The period between the Chinese government's initial announcements of the regulatory changes and the implementation of those changes was significant and provided enough time for market participants to alter their operations, forecasts, guidance and expectations concerning future business in China, including sales and revenue.

> Furthermore, in my opinion, Enzymotec and the management team of the Company either knew, or were reckless in not knowing, that the CFDA and other Chinese regulation agencies were implementing extensive new regulations over the Chinese infant formula production and marketing. These regulations stood to create significant changes to the infant formula manufacturing process in China and would have a dramatic impact on the Chinese infant formula sales, which was an important part of Enzymotec's business operations. These regulatory changes posed a significant and foreseeable negative effect on the profitability of InFat, which represented a significant portion of the Company's revenue.

> Despite this knowledge, Enzymotec did not take all of this known information into account when forecasting its future growth and while completing the public offerings of the Company's securities, including the initial public offering in September 2013 and the secondary public offering in February 2014. By those stages of the process that led to the regulatory changes in the Chinese infant formula market, Enzymotec and its management team either was well aware of these regulatory changes or was reckless in not knowing about them, and either knew or was reckless in not knowing that the Company was facing formidable hurdles to continue to post growth in its sales of InFat in the Chinese market.

62.   Accordingly, despite this knowledge concerning the effects that the new Chinese regulations would have on the Company's business, and in contrast to Enzymotec's representation that it had "regulatory expertise,"[20] the Exchange Act Defendants failed to

---

[20]  *See* "Global: AAK Magazine No. 1, 2011," http://www.aak.com/Global/Magazines/Global/Global%20No%201%202011.pdf; *see also* Enzymotec Company Presentation August 2014, http://files.shareholder.com/downloads/AMDA-262U40/42753058x0x776568/261e414f-4e5c-48ed-beaa-e6ac09eb7a40/Enzymotec%20-%20Company%20Presentation%20August%202014%20%28canaccord%29.pdf   (last   visited May 12, 2015).

disclose this known information to investors, and instead forecasted unsustainable growth in the Company's financial results in order to stoke interest in and complete the Offerings.

        **ii.**      **Biostime's Price-Fixing Scandal And Operational Uncertainty Prior To The Class Period Would Have Also Alerted Enzymotec To Impending Problems**

63.    In March 2013, the Price Supervision and Anti-Trust Bureau under the National Development and Reform Commission of the People's Republic of China ("NDRC") began investigating Biostime and other milk powder manufacturing companies for price-fixing infant formula.[21]  In response to the investigation, Biostime amended its Chinese infant formula distribution contracts and slashed the prices of its infant formula products by up to 10%.[22]

64.    In August 2013, it was announced that six of the investigated manufacturers were found guilty of creating a price monopoly on milk powder products throughout China, a breach of Article 14 of China's Anti-Trust Law.[23]  This investigation led to Biostime being fined 162.9

---

[21] Biostime first announced the investigation on June 27, 2013.  Matters in relation to an Administrative Investigation into a Subsidiary of the Group, Biostime (June 27, 2013), http://www.biostime.com/system/uploads/pdf/Eng%20-%20Matters%20in%20relation%20to%20an%20Administrative%20Investigation%20into%20a%20Subsidiary%20of%20the%20Group.pdf (last visited May 12, 2015); see also Biostime Plummets on Price-Fixing Investigation:  Hong  Kong  Mover, Bloomberg (June 28, 2013), http://www.bloomberg.com/news/articles/2013-06-28/biostime-plummets-on-price-fixing-investigation-hong-kong-mover (last visited May 12, 2015).

[22] See Updates about the Administrative Investigation into a Subsidiary of the Group, Biostime (July  23,  2013),  http://www.biostime.com/system/uploads/pdf/Eng%20-%20Updates%20about%20the%20Administrative%20Investigation%20into%20a%20Subsidiary%20of%20the%20Group.pdf (last visited May 12, 2015).  Biostime was not the only infant formula manufacturer to cut prices following the NDRC probe, as Mead Johnson, Danone and Nestle cut prices by up to 20 percent.  See Kazunori Takada and Michael Martina, China fines milk  powder  makers  $110  million  for  price  fixing, Reuters (Aug. 7, 2013), http://www.reuters.com/article/2013/08/07/us-meadjohnson-china-idUSBRE97512S20130807 (last visited May 12, 2015).

[23] See NDRC Punished Milk Powder Manufacturers for Price Monopoly Violations, China Briefing (Aug. 14, 2013), http://www.china-briefing.com/news/2013/08/14/ndrc-punishes-milk-powder-manufacturers-for-price-monopoly-violations.html (last visited May 12, 2015).

million yuan, equivalent to six percent of its 2012 sales.[24]   Of the six companies fined by the NDRC, Biostime received the heaviest penalty because it "seriously violated the anti-monopoly law and failed to actively take corrective action," unlike other companies that "cooperated with the investigation, provided important evidence and carried out active self-rectification."[25]   The fines were for restricting competition, setting curbs on minimum prices for distributors and for using a variety of methods to disrupt market order.[26]   Peter Wang, an antitrust expert, stated that "[t]hese are really significant fines for China, which has typically not issued large finds for antitrust violations."[27]

65.     The corrective actions imposed by the NDRC on Biostime, along with new Chinese regulations on infant formula companies, slowed Biostime's sales growth and reduced its profit margins.  In a December 4, 2013 analyst report, Deutsche Bank noted the key downside risk of "government policy [] curb[ing] growth of non-state-owned infant formula brands." Deutsche Bank also estimated that China's new regulations would negatively impact Biostime's infant formula sales and annual selling price by 5%.[28]   However, the impact was far worse.[29]   In

---

[24]   *See* China issues record anti-trust fines for formula firms, Xinhua (Aug. 7, 2013), http://news.xinhuanet.com/english/china/2013-08/07/c_132610870.htm  (last  visited  May  12, 2015).

[25]   *See* Kazunori Takada and Michael Martina, China fines milk powder makers $110 million for price  fixing,  Reuters  (Aug.  7,  2013),  http://www.reuters.com/article/2013/08/07/us-meadjohnson-china-idUSBRE97512S20130807 (last visited May 12, 2015) (quoting Xu Kunlin, the head of the NDRC's price department).

[26]   *See id.*

[27]   *Id.*

[28]   *See* Winnie Mak, Building a parenting and childcare platform; initiating with Buy, Deutsche Bank AG/Hong Kong (Dec. 4, 2013).

[29]   The December 2013 Deutsche Bank analyst report also mentioned the following: "In China, most of infant formula and baby product brands have a multi-tier distribution system, leaving room for malpractices, e.g. distributors selling products online at a discount and competing directly with retailers are leading to destructive competition."

August 2014, Deutsche Bank, in downgrading the stock from a Buy to a Hold, reported that Biostime's first half of 2014 was a "big miss" as it "missed all of its sales, profit margin, inventory days, etc, guidance" for the period reported.[30]  The government regulations had a dramatic impact on Biostime's infant formula business with net income growth slowing to 11% for the first half of 2014 compared to 54% for the first half of 2013 and gross profit margins reduced by 5.9% for the same periods compared.[31]  These issues were compacted by the fact that Biostime had built up its inventory to approximately double year-over-year with sales increasing 38%, which would have caused concern for the Company's ability to reach its growth targets for the first half of 2014.  Despite knowledge of the operational issues plaguing one of Enzymotec's most important customers, the Exchange Act Defendants materially misled investors concerning the impact of these issues on the Company's business.

### 4. Through The SPO, The Exchange Act Defendants Personally Profited From Their Material Misrepresentations Concerning Enzymotec's Business Prospects

66.    Given these known factors and trends that alerted the Exchange Act Defendants to the impending downturn in Enzymotec's business—including the fall-out from the Chinese regulatory changes, krill oil destocking and issues with AAK that placed the Company's AL joint venture at risk—the Company's insiders sought to capitalize on the substantial increase in Enzymotec's share price following the IPO.  On February 13, 2014—only five months after completing the IPO, and on the same day that the Company reported record earnings for fiscal 2013 and Defendant Katz stated in glowing terms his optimism for the Company's ability to deliver another record performance for fiscal 2014—Enzymotec announced that it would sell

---

[30] *See* Winnie Mak, <u>Nothing is right until 1H15</u>, Deutsche Bank AG/Hong Kong (Aug. 20, 2014).

[31] *See id.*

additional stock to the public in the SPO.  Two weeks later, the Company effectuated the SPO at a price of $28.00 per share—or double the IPO per-share price of $14.00 per share—with existing shareholders selling over 5.4 million shares for proceeds of over $150 million.

67.     In contrast to the IPO, none of the proceeds from the SPO would go to the Company; instead, all of the proceeds from the SPO would go to selling shareholders, including Enzymotec insiders who were selling substantial portions of their ownership positions.  The selling shareholders included Defendants Katz and Bryan, who personally profited nearly $8 million from their sales, as well as several other senior executives and directors of the Company. In total, through the SPO, which was completed on March 5, 2014, Enzymotec executives and directors sold 1.94 million shares for gross proceeds of approximately $54.3 million, which represented 58% of the shares that these insiders collectively owned at the time.  The following table depicts this massive and suspiciously-timed insider selling that took place in the SPO:

### Enzymotec - Insider Participation in the Secondary

| Officers and Directors | | Shares Beneficially Owned: | | Total Shares Sold | % of Shares Sold | Gross Proceeds |
|---|---|---|---|---|---|---|
| | | Prior to Offering | After the Offering | | | |
| Katz | President/CEO | 658,172 | 455,106 | 233,526 | 35% | $6,538,728 |
| Bryan | VP/CFO | 124,100 | 79,055 | 51,802 | 42% | $1,450,456 |
| Doppelt | Vice Chairman | 90,780 | 29,295 | 70,708 | 78% | $1,979,824 |
| Belzer | Director | 1,976,080 | 746,804 | 1,413,667 | 72% | $39,582,676 |
| Pekelman | Director | 26,180 | 16,948 | 10,617 | 41% | $297,276 |
| BenDror | VP: Process Dev. | 145,180 | 100,387 | 51,512 | 35% | $1,442,336 |
| Cohen | Ex-Employee | 102,000 | 70,530 | 36,190 | 35% | $1,013,320 |
| Kahane | Business Dev. | 81,600 | 56,425 | 28,951 | 35% | $810,628 |
| Twito | COO | 81,600 | 56,425 | 28,951 | 35% | $810,628 |
| Zamir | Ex-Employee | 35,700 | 23,112 | 14,476 | 41% | $405,328 |
| **Total** | | **3,321,392** | **1,634,087** | **1,940,400** | **58%** | **$54,331,200** |

C.      **The Truth Emerges**

68.     On May 14, 2014, Enzymotec issued a press release announcing financial results for the quarter ending March 31, 2014, wherein it only partially revealed the Company's precarious financial position.  In fact, Enzymotec reported increasing first quarter financial results, including that net revenues increased 29.1% to $17.9 million under the equity method, and 43.5% to $23.7 million under the proportionate consolidation method; net income increased 118.0% to $5.1 million; non-GAAP net income increased 135.3% to $5.6 million; adjusted EBITDA increased 119.3% to $6.5 million; and quarterly operating cash flow of $4.8 million.

69.     However, Defendants partially revealed the precarious state of Enzymotec's business by disclosing that the Company's Chinese operations may experience problems due to changes in Chinese regulations over infant formula manufacturing.  In this regard, the press release stated as follows:

> The Company expects second quarter net revenues and earnings to be equal to or lower than the second quarter of 2013.  As the Company previously disclosed, in the second quarter it plans to install new equipment to increase its manufacturing capacity, which will require a temporary shutdown of the plant. Additionally, recent changes in Chinese regulations require infant formula manufacturers to make certain changes to their production chain.  As a result, changes may be required to supply arrangements in response to customer requests. The Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year.

70.     In addition, as a result, Enzymotec updated its guidance for fiscal year 2014, which it had issued three months earlier at the same time that it was effectuating the SPO.  The Company's new guidance included: "Net revenues, based on the equity method of accounting, of $68 million to $85 million, an increase of 5% to 31% over fiscal year 2013; Net revenues, based on the proportionate consolidation method, of $90 million to $110 million, an increase of 12% to

36% over fiscal year 2013; Non-GAAP net income of $15 million to $22 million, an increase of

9% to 60% over fiscal year 2013; and Non-GAAP diluted EPS of $0.64 to $0.94."

71.     Commenting on Enzymotec's financial results and revised guidance, Defendant

Katz remained optimistic concerning the Company's business, stating the following in

Enzymotec's press release:

> "Our team continues to execute on our strategic growth initiatives and leverage
> our core strengths, including infant nutrition and health and wellness, to generate
> solid first quarter growth in net revenues, strong margin expansion and robust
> earnings," stated Dr. Ariel Katz, Enzymotec's President and Chief Executive
> Officer. "While we are pleased with our start to fiscal 2014, we expect to face a
> challenging second quarter and, as a result, are reducing our outlook for the year.
> We believe these headwinds will mainly impact us in the second quarter and
> remain optimistic in our outlook for second half of the year due to improved
> supply/demand dynamics across our business segments."
>
> Dr. Katz concluded, "Notwithstanding our outlook for the second quarter, I
> believe Enzymotec is well positioned for future growth in revenues and profit as
> we continue to expand our customer base across our Nutrition and Vaya Pharma
> segments and further leverage our global infrastructure in order to capitalize on
> the growth opportunities in front of us."

72.     On this news, the Company's share price dropped $6.48 per share on May 14,

2014 to close at $13.75 per share, a one-day decline of over 32% on heavy trading volume.

Despite this partial disclosure, the Company's common stock remained inflated due to the

Exchange Act Defendants' failure to fully disclose the issues with the Company's business

operations.

73.     In fact, analysts cited the "temporary" nature of the "headwinds" that Enzymotec

referenced in the earnings release.  For instance, Jefferies had issued a report on April 2, 2014 in

advance of the Company's earnings release in which it stated that it "expect[ed] Enzymotec to

address directly the Biostime inventory build," and noting that since the Company generates 90%

of InFat sales in Asia, a Biostime destocking "would make upside to our . . . forecast difficult."

A Jefferies report on May 14, 2014 after Enzymotec's earnings announcement reiterated a

"Hold" rating and noted that the Company's "fundamentals appear intact."  Wells Fargo issued a report on May 14, 2014, which maintained an "Outperform" rating for the Company and noted "temporary headwinds including China regulations."  Also on this date, Wedbush issued a report in which it also maintained an "Outperform" rating and noted that the "[l]owered 2014 guidance due to seemingly temporary challenges impacting Q2 performance."  A Canaccord | Genuity report on this date highlighted the temporary nature of Enzymotec's disclosure:

> However, the guidance for Q2 was quite weak, basically assuming a flat quarter YOY in terms of both revenue and earnings.  There are three culprits, but <u>the most significant and the one that we did not anticipate in any respect is what will be essentially an inventory deload of InFat ingredients in the production channel for China-based infant formula sales</u>.

> What has occurred is a policy from China that requires ENZY's infant formula customer (the vast majority of ENZY's InFat business ends up in the Chinese infant formula market) to consolidate its third-party production partners.  To date, InFat would be shipped to multiple contract manufacturers that are each producing product for a single infant formula player such as Biostime who is selling into the Chinese infant formula market.  Under the new policy for China destined sales, Biostime is required to consolidate its production partners to ensure greater quality/tracking/etc.  As such, the number of warehouses holding ready inventory of InFat for production will be significantly reduced and thus a channel deload is occurring within the supply chain of ENZY's largest InFat customer.  Given these changes have no impact on end market demand, this should be a short-term impact.  However, we do not know the exact amount of the de-load, of course.  <u>What is implied in guidance and our forecast is a one quarter phenomenon</u>.

74.     On May 15, 2014, the Company issued a press release titled, "Enzymotec Reports a Request for Arbitration by AAK," wherein the Company reported issues with its joint venture partner yet failed to disclose the full extent and impact that these issues had on the Company's business and operations.  The press release stated as follows:

> Enzymotec Ltd. (Nasdaq:ENZY) (the "Company"), a developer, manufacturer and marketer of innovative bio-active lipid ingredients, reports that it was informed today that AarhusKarlshamn AB, or AAK, a Sweden-based, global producer of specialty oils that is Enzymotec's joint venture partner in Advanced Lipids AB, submitted a claim for arbitration against the Company seeking certain declaratory relief with respect to the joint venture agreement.

* * *

AAK is of the view that the Company's disclosures in connection with its initial public offering violated the non-disclosure obligations related to Advance Lipids contained in the joint venture agreement. The Company believes that its disclosures in connection with its initial public offering were in compliance with the joint venture agreement. The Company held various discussions with AAK on this matter over the past few months and did not reach an agreement. AAK has now submitted a request for arbitration to the International Chamber of Commerce in the Netherlands seeking a determination of the arbitrators that the Company's disclosure of information was an intentional, material breach of the joint venture agreement. The request indicates that AAK believes AL is exposed to likely damage in the future as a result of the level of disclosure that the Company made about it; however, it does not provide any specific instance of this having occurred. The request does not state a measure of damages, seek termination of the joint venture agreement or seek to determine what harm, if any, was caused to Advance Lipids or AAK. In addition, the request for arbitration seeks declaratory relief as to the correct interpretation of certain provisions of the joint venture agreement concerning the period of time during which the buy-sell mechanism included in the agreement may be triggered.

The Company believes that the claims made by AAK are without merit and intends to vigorously defend its position. Under the joint venture agreement, pending such dispute, the parties are required to continue to conduct the operations of the joint venture in accordance with the agreement.

75.     On May 16, 2014, in response to Enzymotec's announcement concerning AAK arbitration claim, Wells Fargo published a report in which it stated that it viewed this news as negative for the Company's outlook for two reasons, including increased litigation risk and, notably, because Wells Fargo viewed "infant nutrition [as] our primary long term value creation vehicle."  A May 18, 2014 Jefferies report noted that the AAK dispute as a reason for concern, and that "a material breach ruling in the arbitration [is] a worst case scenario, given the potential impact on the JV structure."

76.     On July 18, 2014, a Canaccord | Genuity report noted that "the timing of InFat recovery comes into question" as "[c]ommentary from Advanced Lipids JV partner AAK suggests the recent regulatory changes for Chinese infant nutrition producers continue to

adversely impact infant formula ingredient sales." The "Investment Conclusion" section of the report went into more detail, stating the following:

> We suspect the temporary disruption in InFat sales growth owing to contract manufacturer consolidation in the Chinese infant nutrition market could extend longer than previously thought. While expectations have been set for returned InFat sales growth in H2/14, recent commentary from ENZY's InFat JV partner AAK suggests this recovery could be a bit slower and more apparent beginning in the Q4 timeframe. Specifically, AAK noted "Infant Nutrition volumes showed some growth but materially less than expected, mainly due to market disruption in relation to new Chinese regulations for infant formula producers. This market is expected to continue to grow more strongly from the fourth quarter, 2014."

77. The full extent of Enzymotec's fraud was revealed when the Company disclosed additional problems with its business and operations on August 5, 2014, in a press release announcing financial results for the period ending June 30, 2014. Specifically, Enzymotec reported that second quarter net revenues decreased 39.5% to $9.0 million under the equity method, and 34.4% to $11.5 million under the proportionate consolidation method; second quarter net income decreased to $0.4 million, and EBITDA decreased to $1.2 million. Enzymotec's financial results were disastrous and stand in stark contrast to the financial results the Company posted leading up to the IPO and during the first few quarters of the Class Period:







| DATE | PERIOD | ESTIMATE | ACTUAL | SURPRISE |
|------|--------|----------|--------|----------|
| 11/11/13 | Q3 2013 | 0.118 | 0.130 | 10% |
| 02/13/14 | Q4 2013 | 0.110 | 0.200 | 82% |
| 05/14/14 | Q1 2014 | 0.168 | 0.240 | 43% |
| 08/05/14 | Q2 2014 | 0.098 | 0.020 | -80% |

78.   The press release included the following commentary from Defendant Katz:

In the second quarter our business experienced operational challenges based on external market dynamics which hindered our financial performance," stated Dr. Ariel Katz, Enzymotec's President and Chief Executive Officer. "While we expected these headwinds in the quarter, particularly related to recent regulatory changes in the Chinese infant formula market and weakness in the U.S. and Australian Omega-3 industry, their overall impact was greater than anticipated and will continue to adversely impact Enzymotec for at least the next two quarters."

79.   In the press release, Enzymotec also decreased guidance yet again for 2014 as follows: "Net revenues, based on the equity method of accounting, of $46 million to $52 million; Net revenues, based on the proportionate consolidation method, of $62 million to $70 million; Non-GAAP net income of $8 million to $10 million; and Non-GAAP diluted EPS of $0.34 to $0.43."   Accordingly, in just five months after successfully completing the SPO in which

Enzymotec insiders sold approximately $54.3 million of their personal Company stock, Enzymotec slashed its net revenue guidance in its key financial metrics by as much as 55%:

### Full Year 2014 Guidance
(mm except for diluted EPS)

|  | 02/13/14 | 05/14/14 | 08/05/14 | Mid-Point Change |
|---|---|---|---|---|
| Net Revenue (Consolidation Method) | $110 – $120 | $90 – $110 | $62 – $70 | -43% |
| Net Revenue (Equity Method) | $88 – $95 | $68 – $85 | $46 – $52 | -46% |
| Non-Gaap Net Income | $18 – $22 | $15 – $22 | $8 – $10 | -55% |
| Non-GAAP diluted EPS | $0.77 – $0.94 | $0.64 – $0.94 | $0.34 – $0.43 | -55% |





37

80.     Analysts were shocked by the extent of Enzymotec's financial straits.   For instance, on the day of this disclosure, Wells Fargo issued a flash comment titled "ENZY: Top Line Shortfall Drives Big Q2 EPS Miss And Negative 2014 Guidance," which commented that the Company's "2014 Guidance [was] disappointing" and that "China formula industry supply chain transition headwinds linger at least into early 2015; much longer than the 1-2 quarters initially expected."   On this same date, Wedbush lowered its price target for Enzymotec from $25.00 to $14.00.   An August 6, 2014 Wells Fargo report downgraded Enzymotec stock to "Market Perform."   A Jefferies report on this same date noted that "Q2 EPS of $0.02 was $0.12 below our forecast and $0.10 below consensus."   The Jefferies report further noted that the Company's "krill oil sales [were] negatively impacted by destocking and customer share losses." A Canaccord | Genuity report noted that Enzymotec's "challenging period extends beyond simply Q2" and that sales of InFat were "softer than even tempered expectations."   The report further emphasized that "InFat end-market challenges are constraining growth" and "recent fears that a recovery might not occur until Q4 were somewhat optimistic."   In addition to reducing the Company's price target, the report also noted that "[t]he magnitude and abruptness of the declines within the nutrition business were far more pronounced than anticipated."

81.     An August 7, 2014 *SeekingAlpha* article entitled, "Enzymotec: Declining Expectations and a lot of Uncertainty," stated that "Enzymotec's Q2 report was disastrous," and that although the Company "warned earlier about the short-term headwinds that it is facing, the results were much worse."   The article noted that Enzymotec experienced slower sales in China due to the new government policies for the infant nutrition industry, which "created increased pricing pressure and competition from local and international brands."   An August 20, 2014

Zack's Equity Research article[32] noted the frequent downward estimate revisions concerning Enzymotec as a reason to sell the Company's stock:

> One such stock that you may want to consider dropping is Enzymotec Ltd. (ENZY), which has witnessed a significant price decline in the past four weeks, and it has seen negative earnings estimate revisions for the current quarter and the current year. A Zacks Rank #4 (Sell) further confirms weakness in ENZY.
>
> A key reason for this move has been the negative trend in earnings estimate revisions. For the full year, we have seen 4 estimates moving down in the past 30 days, compared with no upward revisions. This trend has caused the consensus estimate to trend lower, going from 82 cents a share a month ago to its current level of 38 cents.

82.    As a result of Enzymotec's full and belated disclosure of its true financial state, the Company's stock price declined $5.85 per share on August 5, 2014 to close at $9.11 or nearly 40%, on heavy trading volume.   In total, over the course of two partial disclosures, the Company's stock price plummeted over 72% from its Class Period high of $33.44.   The following chart depicts the effect that Defendants' false and misleading statements had on the Company's stock price during the Class Period leading up to the suspiciously-timed SPO and the devastating effect of Enzymotec's disclosures on the Company's stock price:

---

[32] Zacks Equity Research, Why Enzymotec (ENZY) Could Be Positioned for a Slump, (Aug. 20, 2014),  http://finance.yahoo.com/news/why-enzymotec-enzy-could-positioned-114556139.html.



### D. The Exchange Act Defendants' False And Misleading Statements And Omissions

83.     In regular press releases, conference calls, and filings with the SEC, Enzymotec and the Officer Defendants regularly made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### 1. False Statements Regarding Guidance

84.     During the Class Period, the Exchange Act Defendants made statements concerning the expectation of Enzymotec's finances and operations for fiscal year 2014. Because the Exchange Act Defendants' misrepresentations and omissions artificially inflated the Company's financials, the Exchange Act Defendants reported false financial results and made false assurances concerning such metrics.

85.     In the Company's February 13, 2014 press release announcing financial results for the quarter and fiscal year ending December 31, 2013, Defendant Katz stated the following:

[f]or fiscal year 2014, we believe our revenue momentum will build sequentially throughout the year and enable us to report another record performance… Looking ahead, we are very optimistic about our long-term growth prospects based on our competitive market position. As our product distribution accelerates in new and existing markets, consumers globally are increasingly using our innovative, proprietary lipid-based products to address their health and wellness needs.

86.     The February 13, 2014 press release also included the following discussion regarding growing net revenues and Enzymotec's guidance ranges in regards to the Company's outlook for 2014:

**Outlook for 2014**

For the full fiscal year 2014 the Company provides the following guidance ranges:

- Net revenues, based on the equity method of accounting, of $88 million to $95 million, an increase of 35% to 46%

- Net revenues, based on the proportionate consolidation method, of $110 million to $120 million, an increase of 36% to 49%

- Non-GAAP net income of $18 million to $22 million, an increase of 31% to 60%

- Non-GAAP diluted EPS of $0.77 to $0.94* * *

The Company expects net revenues to continue to grow on a sequential basis throughout the year; however, the second half of the year will contribute the majority of the growth in revenues as new manufacturing capacity becomes available.

87.     Defendant Katz also made the following representations in the Company's May 14, 2014 Q1 2014 earnings press release:

"Our team continues to execute on our strategic growth initiatives and leverage our core strengths, including infant nutrition and health and wellness, to generate solid first quarter growth in net revenues, strong margin expansion and robust earnings," stated Dr. Ariel Katz, Enzymotec's President and Chief Executive Officer. "While we are pleased with our start to fiscal 2014, we expect to face a challenging second quarter and, as a result, are reducing our outlook for the year. We believe these headwinds will mainly impact us in the second quarter and remain optimistic in our outlook for second half of the year due to improved supply/demand dynamics across our business segments."

Dr. Katz concluded, "<u>Notwithstanding our outlook for the second quarter, I believe Enzymotec is well positioned for future growth in revenues and profit as we continue to expand our customer base</u> across our Nutrition and Vaya Pharma segments and further leverage our global infrastructure in order to capitalize on the growth opportunities in front of us."

88.     The May 14, 2014 press release included the following revised guidance ranges in

regards to the Company's outlook for 2014:

**Outlook for 2014**

For the full fiscal year 2014 the Company updates its guidance as follows:

- Net revenues, based on the equity method of accounting, of $68 million to $85 million, an increase of 5% to 31% over fiscal year 2013

- Net revenues, based on the proportionate consolidation method, of $90 million to $110 million, an increase of 12% to 36% over fiscal year 2013

- Non-GAAP net income of $15 million to $22 million, an increase of 9% to 60% over fiscal year 2013

- Non-GAAP diluted EPS of $0.64 to $0.94

The Company expects second quarter net revenues and earnings to be equal to or lower than the second quarter of 2013.  As the Company previously disclosed, in the second quarter it plans to install new equipment to increase its manufacturing capacity, which will require a temporary shutdown of the plant.  Additionally, recent changes in Chinese regulations require infant formula manufacturers to make certain changes to their production chain.  As a result, changes may be required to supply arrangements in response to customer requests.  <u>The Company does not expect this change in Chinese regulations to impact its 2014 revenues, but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year</u>.  Finally, recent weakness in the Omega-3 market had a negative impact, combined with weather conditions in the U.S. at the beginning of 2014, which resulted in delayed renewal orders from krill oil customers in the U.S., and additional market factors negatively impacted the Australian krill oil market.  This is expected to be partially offset by increased demand from emerging territories, such as Europe and the Far East, in the second half of 2014.

89.     Also on May 14, 2014, the Company held the Enzymotec First Quarter 2014

Earnings Conference Call.  Defendant Katz stated the following:

In the near-term, as I am sure many of you are aware; there has been recent Chinese regulation change that require(s) infant formula manufacturing –

manufacturers to consolidate their production chain.   As a result, we expect certain changes to supply agreement to supply arrangement, which customers – in response to customer request.   <u>The changes in Chinese regulation should not []</u> <u>impact our 2014 revenues,</u> but we do expect that this will result in revenues being <u>shifted from the second quarter to the second half of the year</u>.

90.     The previously emphasized statements concerning the guidance provided to investors in February and May 2014 were materially false and misleading.  Specifically, and in contrast to Enzymotec's "regulatory expertise" which it touted to investors, the Exchange Act Defendants knew, or were reckless in disregarding, significant information and red flags prevalent as early as May 2013—prior to the start of the Class Period—that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations.  As discussed above and in the Guo Declaration, these regulatory changes were widely known by participants in the Chinese infant formula market, were issued for public comment and were implemented at the beginning of the Class Period and through November and December of 2013.

91.     Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility on sales" derived from the Company's multi-year contracts with its customers, and yet the Exchange Act Defendants knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales.   Additionally, the Company knowingly or recklessly failed to account for the fact that a large percentage of Enzymotec's growth in krill sales from 2012 to 2013 leading up to the IPO were obtained on the strength of additional sales to a single customer who placed initial orders with the Company in 2012 and significantly increased those orders in

2013, thus rendering the Company dependent on these sales to maintain the business and growth projections provided to investors in order to stoke interest in the SPO.

92.     Accordingly, Defendants provided a materially false and misleading depiction of the Company's fiscal year 2014 guidance during the Class Period—misrepresentations which were not corrected until the truth concerning Defendants' InFat and krill oil sales was belatedly revealed at the end of the Class Period.

### 2.     False Statements Regarding Chinese Sales Of InFat

93.     Throughout the Class Period, Defendants repeatedly made false and misleading statements, and omitted to state material facts, regarding Enzymotec's operations in the Chinese markets, strength in its relationships with its then-current customers, and its ability to attract new customers.  The first of these false statements in regards to InFat's strength in Chinese markets was included in Enzymotec's IPO Offering Documents:

> As a result, we believe InFat is the most significant development to infant formula ingredients since DHA and ARA were introduced to the market almost 15 years ago. The next generation of our infant formula ingredient products targets additional attributes of key lipids found in human breast milk such as improved brain development. InFat has been achieving rapid penetration in the Chinese and other Asian markets, and we believe that we have significant opportunities in other developing markets and developed markets such as North America and Europe.[33]

* * *

_____

[33] This statement was repeated in identical form in the following: Form DRS/A Amended DRS filed with the SEC on August 14, 2013 ("IPO DRS/A") at 2, 72; Form F-1 Registration Statement filed with the SEC on August 22, 2013 ("IPO F-1") at 2, 72; Form F-1/A Amended Registration Statement for Foreign Issuers filed with the SEC on September 16, 2013 ("IPO F-1/A") at 2, 72; Form 424B4 filed with the SEC on September 30, 2013 (the "IPO Prospectus") at 2, 72; 2013 Form 20-F filed on February 13, 2014 ("2013 Form 20-F") at 28; Form F-1 Registration Statement filed with the SEC on February 13, 2014 ("SPO F-1") at 2, 68; Form F-1/A Amendment No. 2 to Form F-1 Registration Statement under the Securities Act of 1933 filed with the SEC on February 24, 2014 ("SPO F-1/A") at 2, 69; Prospectus filed with the SEC on Form 424B1 filed March 3, 2014 ("SPO Prospectus") at 2, 69.

The change was due to…an increase of [$5.8 million] in the volume of sales of InFat by AL, which we believe reflects <u>increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market.</u>[34]

\* \* \*

…an increase of $6.3 million in the volume of sales of InFat by AL, which we believe reflects <u>increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market.</u>[35]

94.    In addition, in the July 10, 2013 Form DRS Draft Registration Statement, the

Company touted its continued strength in its relationships with its then-current customers for the

InFat product, as well as its ability to attract new customers, stating the following:

Strong customer relationships - We have long-term relationships with leading infant nutrition, nutritional supplement and pharmaceutical companies, including Biostime, IVC and Teva. <u>We have multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales.</u>[36]

\* \* \*

<u>Furthermore, we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime and IVC in our Nutrition segment, builds consumer awareness of our premium products. Sales of our infant formula products are currently strongest in China,</u> while sales of our other nutrition products are strongest in the United States and Australia. We plan to utilize our global presence to cross-market products in our different

---

[34] The July 20, 2013 Form DRS Draft Registration Statement stated that the $5.8 million figure was $2.7 million, as it was only calculating the net revenues of Enzymotec's Nutrition segment in the three months ended March 31, 2013, instead of the six months ended June 30, 2013.  The above statement was repeated in substantially identical form in: IPO DRS/A at 54; IPO F-1 at 54; IPO F-1/A at 54; IPO Prospectus at 54.

[35] This statement was repeated in identical form in the following: IPO DRS/A at 57; IPO F-1 at 57; IPO F-1/A at 57; 2013 Form 20-F at 54; SPO F-1 at 55; SPO F-1/A at 56; SPO Prospectus at 56.

[36] This statement was repeated in identical form in the following: IPO DRS/A at 5, 74; IPO F-1 at 5, 74; IPO F-1/A at 5, 74; IPO Prospectus at 5, 74; SPO F-1 at 5, 70; SPO F-1/A at 5, 71; SPO Prospectus at 5, 71.

geographies and build awareness of our premium products among branded product manufacturers.[37]

* * *

Sales of our InFat product are made through AL to companies that provide balanced infant nutrition products, primarily in China. <u>We expect net revenues to increase as additional infant nutrition brands choose to use InFat</u> as a differentiating factor for their premium products.[38]

95.     Similarly, on November 11, 2013, the Company held a conference call for the results for the quarter ending September 30, 2013, where Defendant Katz stated that "InFat has been <u>achieving rapid penetration in Chinese and other Asian markets</u>…"

96.     Also on February 13, 2014, the Company held a conference call to review the financial results for the fourth quarter and fiscal year ended December 31, 2013.  During the call, the following exchange occurred between Defendant Bryan and analyst David Lee.

DAVID LEE, ANALYST: My question specifically is on InFat.  I was hoping that you could provide an update on the adoption of InFat.  Can you give us any more detail around the progress of additional manufacturers adopting the use of the ingredient?

OREN BRYAN: <u>We see continuous growth and interest,</u> unfortunately, due to confidentiality with companies we cannot disclose the names.  <u>But I would say in general that we feel on track with what we have spoken in the – when we went to the IPO and we see a good acceptance of the products continue.</u>

97.     During the February 13, 2014 conference call, Defendant Katz also made the following representations regarding InFat's customer base in the following exchange:

LAURENCE ALEXANDER, ANALYST: So, couple of different things.  First, on InFat, can you talk a little bit about what you are seeing in the opportunities to pick up market share as competitor long-term agreements roll over.  At least the

---

[37] This statement was repeated in identical form in: IPO DRS/A at 5, 75; IPO F-1 at 5, 75; IPO F-1/A at 5, 75; IPO Prospectus at 5, 75; SPO F-1 at 5, 71; SPO F-1/A at 5, 72; SPO Prospectus at 5, 72.

[38] This statement was repeated in identical form in: IPO DRS/A at 50, 54; IPO F-1 at 50, 54; IPO F-1/A at 50, 54; IPO Prospectus at 50, 54; 2013 Form 20-F at 47; SPO F-1 at 48; SPO F-1/A at 49; SPO Prospectus at 49.

first few agreements look like they have already rolled over without any shift in market share, but I wonder if you can just give your perspective on what is happening there?

ARIEL KATZ: Okay.  So, first of all for the future growth, we see two main domains of continue to increase the business.  One is infant formula is divided to premium production and non-premium product, so definitely we started to see the movement from those who launched a product only at the beginning on premium products to non-premium products.  And is an exten[sion] of the use of the infant and become standard.

And the second is in the areas or countries that we have not incorporated, instead as a main innovative product, we see a possibility that they will incorporate the product and we will expand the use of infant behind the current customers and markets that we currently operated of sales.  <u>Regarding the contracts that we have in our – with our customers, we feel confident, we're striving all the time to bring more value and it seems that is very stable contracts</u>.

98.     In the Company's 2013 Form 20-F, the following representations were made in

regards to InFat's strength in Chinese markets:

The change was due to…an increase of $15.8 million in the volume of sales of InFat by AL, which we believe reflects <u>increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market</u>.[39]

99.     Further, on May 14, 2014, the Company held the Enzymotec First Quarter 2014

Earnings Conference Call.  Defendant Katz stated the following:

ARIEL KATZ: In our Nutrition segment, customers who follow infant nutrition product include some of the leading providers of infant formula in the world and in the first quarter, we made progress with key new customers.

InFat, which is sold and marketed by Advanced Lipids, our joint venture with AAK <u>has also been achieving rapid penetration in Chinese</u> and other Asian market(s) and we believe that we have a significant opportunity in other developing market and developed market(s) such as North America and Europe.

100.    The previously emphasized statements concerning the Company's sales of InFat

in China were materially false and misleading.  Specifically, and in contrast to Enzymotec's

"regulatory expertise" which it touted to investors, the Exchange Act Defendants knew, or were

---

[39] This statement was repeated in identical form in the following: SPO F-1 at 52; SPO F-1/A at 53; SPO Prospectus at 53.

reckless in disregarding, significant information and red flags prevalent as early as May 2013—prior to the start of the Class Period—that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations. As discussed above and in the Guo Declaration, these regulatory changes were widely known by participants in the Chinese infant formula market, were issued for public comment and were implemented at the beginning of the Class Period and through November and December of 2013.

101.    Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility on sales" derived from the Company's multi-year contracts with its customers, and yet the Exchange Act Defendants knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales.

102.    Accordingly, Defendants provided a materially false and misleading depiction of the Company's InFat sales in the Chinese market during the Class Period—misrepresentations which were not corrected until the truth concerning Defendants' InFat sales was belatedly revealed at the end of the Class Period.

### 3.    False Statements Regarding Chinese Regulations

103.    The Company's May 14, 2014, press release announcing financial results for the quarter ending March 31, 2014 made the following false and misleading statements regarding Chinese regulations and the impact thereof:

> "[R]ecent changes in Chinese regulations require infant formula manufacturers to make certain changes to their production chain.  As a result, changes may be required to supply arrangements in response to customer requests. <u>The Company does not expect this change in Chinese regulations to impact its 2014 revenues,</u>

but it does expect that this will result in revenues being shifted from the second quarter to the second half of the year."

104.    During the 1Q 2014 earnings call on May 14, 2014, Defendant Bryan misleadingly stated:

Additionally, recent changes in Chinese regulation requires infant formula manufacturers to make certain changes to their production chain.  As a result, changes may be required to supply arrangement in response to customer requests. We believe this will result in revenues being shifted from the second quarter to the second half of the year.

105.    During the June 5, 2014 Jefferies 2014 Global Healthcare Conference, Defendant Katz misleadingly stated:

[W]e see some challenges in quarter two [of 2014] and there are different reasons. The first one is infant nutrition, where new regulation in China regarding operating OEMs that require that there will not be a chain of OEMs, only single OEM which required to re-arrange from the branded company how they operated the OEMs.

106.    During the June 5, 2014 Jefferies 2014 Global Healthcare Conference, the following exchange took place:

Q. And then Chinese regulations, could you expand upon that in terms of just what changes infant formula manufacturers actually have to make? And just what the -- what really -- what specifically, what the impact is on your business?

A.[Katz] Yeah.  The Chinese regulation is new: So, actually just in the last, I'll say a couple of weeks it came clear. The Chinese regulation is -- the new changes in Chinese regulator that is not allowed -- they will request to consolidate from quality control the production. So, if in the past, for example, a Chinese infant formula can operate at one OEM and if it doesn't have enough capacity can operate additional OEM. But these subcontractor of the OEM they are not allowed anymore. So, they request that there will not be one OEM in the chain in this respect and since the business grows dramatically, the Chinese production companies that they have more than one OEM in the chains so it request consolidation.

So, it doesn't impact our not expect to have impacting 2014 because our agreements are not with the OEMs. Our agreements are with the infant formula producers, but they need to shift and to consolidate their production. So, sometimes it request to expand the capacity. Sometimes it request to move to one OEM to the other OEM and this is the change. So, in quarter two, they organize

<u>all the OEMs and therefore we will see slowdown during quarter two and expect
that (inaudible) catch-up in quarter three and quarter four.</u>

107.   The previously emphasized statements concerning the changing Chinese
regulations over the infant formula market in China, and the impact of such regulatory changes
on Enzymotec's business, were materially false and misleading.  Specifically, and in contrast to
Enzymotec's "regulatory expertise" which it touted to investors, the Exchange Act Defendants
knew, or were reckless in disregarding, significant information and red flags prevalent as early as
May 2013—prior to the start of the Class Period—that the Chinese regulatory landscape
concerning the infant formula market was about to undergo a seismic shift that would have a
significantly negative effect on the Company's important InFat sales in China—a core area of
Enzymotec's operations.  As discussed above and in the Guo Declaration, these regulatory
changes were widely known by participants in the Chinese infant formula market, were issued
for public comment and were implemented at the beginning of the Class Period and through
November and December of 2013.

108.   Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility
on sales" derived from the Company's multi-year contracts with its customers, and yet the
Exchange Act Defendants knowingly or recklessly disregarded the changing landscape of the
infant formula industry in China, including the impact of antitrust, disciplinary and overstocking
issues relating to Biostime, the Company's primary customer in China, and the resulting effect
on Enzymotec's InFat sales.

109.   Accordingly, Defendants provided a materially false and misleading depiction of
the Company's exposure and vulnerability to the known changes in Chinese regulations over the
infant formula market during the Class Period—misrepresentations which were not corrected

50

until the truth concerning Defendants' InFat sales was belatedly revealed at the end of the Class Period.

### 4.   False Statements Regarding Internal Controls

110.   Enzymotec's February 13, 2014 Form 20-F included SOX certifications by Defendants Katz and Bryan.   The SOX certifications affirmed that Enzymotec's financial statements were accurate and that Katz and Bryan had designed and implemented internal controls over financial reporting that provided reasonable assurance that Enzymotec's financial reporting was reliable.   Specifically, the SOX certifications provided, in relevant part:

1. I have reviewed this annual report on Form 20-F of Enzymotec Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

111.   The previously emphasized statements concerning the Company's internal controls during the Class Period were materially false and misleading.  Specifically, and in contrast to Enzymotec's "regulatory expertise" which it touted to investors, the Exchange Act Defendants knew, or were reckless in disregarding, significant information and red flags prevalent as early as May 2013—prior to the start of the Class Period—that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations.  As discussed above and in the Guo Declaration, these regulatory changes were widely known by participants in the Chinese infant formula market, were issued for public comment and were implemented at the beginning of the Class Period and through November and December of 2013.

112.   Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility on sales" derived from the Company's multi-year contracts with its customers, and yet the Exchange Act Defendants knowingly or recklessly disregarded the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales.  Additionally, the Company knowingly or recklessly failed to account for the fact that a large percentage of Enzymotec's growth in krill sales from 2012 to 2013 leading up to the IPO were obtained on the strength of additional sales to a single customer who placed initial orders with the Company in 2012 and significantly increased those orders in 2013, thus rendering the Company dependent on these sales to maintain the business and growth projections provided to investors in order to stoke interest in the SPO.

113.     Accordingly, Defendants' statements during the Class Period that Enzymotec had in place effective internal controls were patently false and materially misleading when made.  On the contrary, as discussed above, the Company suffered from material deficiencies in its internal controls, which allowed Defendants' fraudulent behavior to occur in the first place and continue unabated through the duration of the Class Period.

## V.      LOSS CAUSATION

114.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  Throughout the Class Period, the price of Enzymotec's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above, and Lead Plaintiffs and the Class purchased the Company's common stock at artificially inflated prices during the Class Period.

115.     Defendants' disclosures on May 14, 2014 and August 4, 2014 revealed to the market on a piecemeal basis the false, misleading and fraudulent nature of Defendants' statements and omissions, and the extent of the misrepresentations contained in Enzymotec's financial statements that form the primary basis of this action.  When the truth concerning the Company was revealed to the market, the price of Enzymotec common stock declined in response, as the artificial inflation caused by the Company's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of Enzymotec common stock, thereby causing substantial damage to Lead Plaintiffs and other members of the Class.

116.     Indeed, during the Class Period, Enzymotec common stock traded as high as $33.44 per share on December 13, 2013, and closed at $20.23 the day before Enzymotec's May

14, 2014 press release, when the first partial disclosure of the Company's true condition was made.   Over the next three months, in response to two partial disclosures that revealed Enzymotec's true financial condition, the market reacted, and the Company's stock price partially corrected as Enzymotec's stock price was significantly driven downward.   The Company and the Officer Defendants mitigated the impact of these disclosures and prevented the full truth about Enzymotec from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.   As the market finally learned the magnitude of the Company's issues and the implications for Enzymotec's financial condition, the price of the Company's common stock plummeted to $9.11 on August 5, 2014.   The truth emerging about Enzymotec's financial state caused the market price of the Company's common stock to fall $5.87 per share, from $14.98 on August 4, 2014 to $9.11 on August 5, 2014.

117.    It was entirely foreseeable to the Officer Defendants that concealing Enzymotec's problematic operations would artificially inflate the price of the Company's common stock.   It was similarly foreseeable to the Officer Defendants that the revelation of that misconduct and Enzymotec's true financial condition would cause the price of the Company's common stock to drop significantly as the inflation caused by their misstatements and omissions was corrected. Accordingly, the conduct of Enzymotec and the Officer Defendants, as alleged herein, proximately caused foreseeable damages to Lead Plaintiffs and members of the Class.

## VI.    PRESUMPTION OF RELIANCE

118.    At all relevant times, the market for Enzymotec's common stock was efficient for the following reasons, among others:

> (a)    Enzymotec's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Enzymotec filed periodic reports with the SEC and the NASDAQ;

(c)     Enzymotec regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Enzymotec was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

119.   As a result of the foregoing, the market for Enzymotec's common stock reasonably promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Enzymotec's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Enzymotec common stock at artificially inflated prices, and a presumption of reliance applies.

120.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## VII.   <u>NO SAFE HARBOR</u>

121.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about

Enzymotec's present financial condition and its internal controls over financial reporting, among others.  Further, the statutory safe harbor does not apply to statements included in financial statements that were prepared purportedly in accordance with GAAP, including Enzymotec's annual report on Form 20-F issued during the Class Period.

122.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Enzymotec's reserve review and internal controls over financial reporting, among others.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

123.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Enzymotec who knew that the statement was false when made.

## VIII.   CLAIMS FOR RELIEF BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**For Violations Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder
(Against Defendants Enzymotec, Katz and Bryan)**

124.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

125.    This Count is asserted on behalf of all members of the Class against Defendants Enzymotec, Katz and Bryan for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

126.    During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

127.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Enzymotec common stock during the Class Period.

128.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Enzymotec common stock, which

were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Enzymotec's business and growth prospects, the Company's internal controls, and the Company's financial statements; (b) artificially inflate and maintain the market price of Enzymotec common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase Enzymotec common stock at artificially inflated prices and suffer losses when the true facts became known.

129.    Defendants Enzymotec, Katz and Bryan are liable for all materially false and misleading statements made during the Class Period, as alleged above.

130.    As described above, with respect to Lead Plaintiffs' claims brought pursuant to the Exchange Act, the Exchange Act Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Enzymotec stock, were either known to the Exchange Act Defendants or were so obvious that these Defendants should have been aware of them.

131.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Enzymotec common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

132.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the

material misstatements and omissions alleged herein in connection with their purchases of Enzymotec common stock during the Class Period.

## COUNT II

**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Katz and Bryan)**

133.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

134.    This Count is asserted on behalf of all members of the Class against Defendants Katz and Bryan for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

135.    During their tenures as officers and/or directors of Enzymotec, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Enzymotec, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Enzymotec during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

136.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Katz and Bryan had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  Defendants Katz and Bryan signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Enzymotec during the Class

Period.  Defendants Katz and Bryan were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and approving the false statements disseminated by Enzymotec during the Class Period.  As a result of the foregoing, Defendants Katz and Bryan, as a group and individually, were controlling persons of Enzymotec within the meaning of Section 20(a) of the Exchange Act.

137.    As set forth above, Enzymotec violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, Defendants Katz and Bryan are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Enzymotec securities.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Enzymotec, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

138.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Enzymotec common stock.

## IX.    CLAIMS UNDER THE SECURITIES ACT

139.    In this part of the Complaint, Lead Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶195 below, except that Lead Plaintiffs explicitly disclaim subparts [d] and [e] of ¶197 from these Securities Act allegations).  Lead Plaintiffs expressly disclaim any allegations of knowing or reckless

misconduct, and to avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

140.    As a result, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading.

## A.    The Securities Act Parties

### 1.    Lead Plaintiffs

141.    Lead Plaintiff David R. Raabe, as set forth in Mr. Raabe's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock pursuant and/or traceable to the Company's Offerings at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein.

142.    Lead Plaintiff David E. Raabe, as set forth in Mr. Raabe's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock pursuant and/or traceable to the Company's Offerings at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein.

143.    Lead Plaintiff Yehuda L. Danon, as set forth in Mr. Raabe's previously-filed certification and incorporated herein by reference (*see* ECF No. 6-2), purchased Enzymotec common stock pursuant and/or traceable to the Company's Offerings at artificially inflated prices and suffered damages as a result of the violations of the federal securities laws alleged herein.

### 2.    Securities Act Defendants

144.    Each of the following Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in the Offering Documents.  These Defendants are termed the "Securities Act Defendants."

### i.  Enzymotec

145.  As stated above, Enzymotec is a global supplier of specialty lipid-based products and solutions.  Defendant Enzymotec was the issuer of the common stock offered pursuant to the Offerings.

### ii.  The Officer Defendants

146.  Defendant Katz was, at all relevant times, CEO of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

147.  Defendant Bryan was, at all relevant times, CFO of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

### iii.  The Director Defendants

148.  Defendant Jacob (Yaacov) Bachar ("Bachar") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

149.  Defendant Nir Belzer ("Belzer") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.  Belzer participated in the SPO and sold 72% of his shares for proceeds of approximately $39.5 million.

150.  Defendant Yoav Doppelt ("Doppelt") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.  Doppelt participated in the SPO and sold 78% of his shares for proceeds of approximately $1.9 million.

151.    Defendant Steve Dubin ("Dubin") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

152.    Defendant Dov Pekelman ("Pekelman") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.  Pekelman participated in the SPO and sold 41% of his shares for proceeds of $297,276.

153.    Defendant Yossi Peled ("Peled") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

154.    Defendant Imanuel Wasserman ("Wasserman") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

155.    Defendant Yossi Ohana ("Ohana") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO and SPO Registration Statements filed with the SEC.

156.    Defendant Gilead Fortuna ("Fortuna") was, at all relevant times, a director of Enzymotec and signed or authorized the signing of the Company's IPO Registration Statement filed with the SEC.

157.    Defendant Michal Silverberg ("Silverberg") was, at all relevant times, a director of Enzymotec and was named in the Company's SPO Registration Statement as a member of the Company's board of directors.

158.    Defendant Joseph Tenne ("Tenne") was, at all relevant times, a director of Enzymotec and was named in the Company's SPO Registration Statement as a member of the Company's board of directors.

159.    Defendants Katz, Bryan, Bachar, Belzer, Dubin, Doppelt, Pekelman, Peled, Wasserman, Ohana, Fortuna, Silverberg and Tenne are collectively referred to hereinafter as the "Officer and Director Defendants."

160.    The Officer Defendants, Director Defendants, and Enzymotec are collectively referred to herein as the "Securities Act Defendants."

**B.      The Offering Documents Misstated Material Information**

**1.      False And Misleading Statements In Connection With The IPO**

161.    The IPO Offering Documents represented the following in regards to InFat's Chinese market operations:

> As a result, we believe InFat is the most significant development to infant formula ingredients since DHA and ARA were introduced to the market almost 15 years ago. The next generation of our infant formula ingredient products targets additional attributes of key lipids found in human breast milk such as improved brain development. InFat has been achieving rapid penetration in the Chinese and other Asian markets, and we believe that we have significant opportunities in other developing markets and developed markets such as North America and Europe.

> * * *

> The change was due to an increase of $5.8 million in the volume of sales of InFat by AL, which we believe reflects increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market.

> * * *

> …an increase of $6.3 million in the volume of sales of InFat by AL, which we believe reflects increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market.

162.    In addition, the Company touted its continued strength in its relationships with its then-current customers for the InFat product, as well as its ability to attract new customers, stating the following:

Strong customer relationships - We have long-term relationships with leading infant nutrition, nutritional supplement and pharmaceutical companies, including Biostime, IVC and Teva. We have multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales.

\* \* \*

Furthermore, we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime and IVC in our Nutrition segment, builds consumer awareness of our premium products. Sales of our infant formula products are currently strongest in China, while sales of our other nutrition products are strongest in the United States and Australia. We plan to utilize our global presence to cross-market products in our different geographies and build awareness of our premium products among branded product manufacturers.

\* \* \*

Sales of our InFat product are made through AL to companies that provide balanced infant nutrition products, primarily in China. We expect net revenues to increase as additional infant nutrition brands choose to use InFat as a differentiating factor for their premium products.

163.    The previously emphasized statements were false and misleading.  Specifically, and in contrast to Enzymotec's "regulatory expertise" which it touted to investors, there were red flags prevalent as early as May 2013—prior to the Offerings—that the Chinese regulatory landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations.  These regulatory changes were widely known by participants in the Chinese infant formula market, were issued for public comment and were implemented at the beginning of the Class Period and through November and December of 2013.

164.    Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility on sales" derived from the Company's multi-year contracts with its customers, and yet the Company did not adequately disclose the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales.  Additionally, the Company failed to disclose the fact that a large percentage of Enzymotec's growth in krill sales from 2012 to 2013 leading up to the IPO were obtained on the strength of additional sales to a single customer who placed initial orders with the Company in 2012 and significantly increased those orders in 2013, thus rendering the Company dependent on these sales to maintain the business and growth projections provided to investors in order to stoke interest in the Offerings.

### 2.    False And Misleading Statements In Connection With The SPO

165.    The SPO Offering Documents[40] represented the following in regards to InFat's Chinese market operations:

> As a result, we believe InFat is the most significant development to infant formula ingredients since DHA and ARA were introduced to the market almost 15 years ago. The next generation of our infant formula ingredient products targets additional attributes of key lipids found in human breast milk such as improved brain development. InFat has been achieving rapid penetration in the Chinese and other Asian markets, and we believe that we have significant opportunities in other developing markets and developed markets such as North America and Europe.

---

[40] The SPO was conducted pursuant to a Form F-1 Registration Statement filed with the SEC on February 13, 2014 (Registration No. 333-193923), which was later amended by, *inter alia*, Form F-1/A Amendment No. 1 to Form F-1 Registration Statement under the Securities Act of 1933 filed with the SEC on February 18, 2014, Form F-1/A Amendment No. 2 to Form F-1 Registration Statement under the Securities Act of 1933 filed with the SEC on February 24, 2014 (collectively, the "SPO Registration Statement"); and a Prospectus filed with the SEC on Form 424B1 filed March 3, 2014 (the "SPO Prospectus," together with the Registration Statement, the "SPO Offering Documents").

\* \* \*

The change was due to an increase of $5.8 million in the volume of sales of InFat by AL, <u>which we believe reflects increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market</u>.

\* \* \*

…an increase of $6.3 million in the volume of sales of InFat by AL, <u>which we believe reflects increased market penetration due to growing awareness of the benefits of InFat, especially in the Chinese market</u>.

166.   The SPO Offering Documents made the following statements regarding the Company's continued strength in its relationships with its then-current customers for the InFat product, as well as its ability to attract new customers:

"Strong customer relationships - We have long-term relationships with leading infant nutrition, nutritional supplement and pharmaceutical companies, including Biostime, IVC and Teva. <u>We have multi-year contracts with many of our customers and are embedded within their product development cycles, resulting in high switching costs for them and providing us with good visibility on sales</u>.

\* \* \*

<u>Furthermore, we expect to continue attracting new customers as the strong brand recognition of our existing key customers, such as Biostime and IVC in our Nutrition segment, builds consumer awareness of our premium products. Sales of our infant formula products are currently strongest in China</u>, while sales of our other nutrition products are strongest in the United States and Australia. We plan to utilize our global presence to cross-market products in our different geographies and build awareness of our premium products among branded product manufacturers.

\* \* \*

Sales of our InFat product are made through AL to companies that provide balanced infant nutrition products, primarily in China. <u>We expect net revenues to increase as additional infant nutrition brands choose to use InFat</u> as a differentiating factor for their premium products.

167.   The previously emphasized statements were false and misleading.  Specifically, and in contrast to Enzymotec's "regulatory expertise" which it touted to investors, there were red flags prevalent as early as May 2013—prior to the Offerings—that the Chinese regulatory

landscape concerning the infant formula market was about to undergo a seismic shift that would have a significantly negative effect on the Company's important InFat sales in China—a core area of Enzymotec's operations.  These regulatory changes were widely known by participants in the Chinese infant formula market, were issued for public comment and were implemented at the beginning of the Class Period and through November and December of 2013.

168.    Moreover, Enzymotec regularly stated that the Company enjoyed "good visibility on sales" derived from the Company's multi-year contracts with its customers, and yet the Company did not adequately disclose the changing landscape of the infant formula industry in China, including the impact of antitrust, disciplinary and overstocking issues relating to Biostime, the Company's primary customer in China, and the resulting effect on Enzymotec's InFat sales.  Additionally, the Company failed to disclose the fact that a large percentage of Enzymotec's growth in krill sales from 2012 to 2013 leading up to the IPO were obtained on the strength of additional sales to a single customer who placed initial orders with the Company in 2012 and significantly increased those orders in 2013, thus rendering the Company dependent on these sales to maintain the business and growth projections provided to investors in order to stoke interest in the Offerings.

## X.    CLAIMS FOR RELIEF BROUGHT PURSUANT TO THE SECURITIES ACT

### COUNT III

**For Violations Of Section 11 Of The Securities Act In Connection With The Offerings Against The Securities Act Defendants**

169.    Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  Defendants' liability under this Claim for Relief is predicated on the participation of each Defendant in conducting the IPO and/or SPO pursuant to the IPO and/or SPO Offering Documents, which contained untrue statements and omissions of

material fact.  This Claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and their other claims under the Securities Act, Lead Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

170.    This claim is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offerings and were damaged by the acts alleged herein.  This claim is based solely in strict liability and negligence.  Defendant Enzymotec was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the IPO and SPO Offering Documents (defined in ¶¶29, 165 above) of the registered securities set forth below.

171.    As discussed above, in September 2013, Enzymotec issued and sold to investors 5,073,800 shares of common stock in the IPO.  Also as discussed above, in February 2014, Enzymotec issued and sold to investors 5,403,685 shares of common stock in the SPO.  The Officer and Director Defendants each signed the IPO and/or SPO Registration Statement—included in the IPO and/or SPO Offering Documents—as a senior officer and/or director of Enzymotec within the meaning of Section 11 of the Securities Act.

172.    The common stock described in this Count was issued and sold pursuant to the IPO and SPO Offering Documents.  All purchases of the registered securities after the issuance of the IPO and SPO Offering Documents are traceable to the IPO and SPO Offering Documents.

173.    The IPO and SPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

174.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the IPO and SPO Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Lead Plaintiffs' Securities Act claims, as set forth above.

175.    In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

176.    As the issuer of the registered securities, Enzymotec is strictly liable for the untrue statements of material fact and material omissions described herein.

177.    None of the other Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO and SPO Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

178.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the IPO and SPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

179.     As a direct and proximate result of the Securities Act Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the common stock pursuant to the IPO and SPO Offering Documents.

180.     By reason of the foregoing, the Securities Act Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the IPO and SPO Offering Documents.

181.     This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the IPO and SPO Offering Documents.

## COUNT IV

### For Violations Of Section 12(a)(2) Of The Securities Act In Connection With The Offerings Against Defendant Enzymotec

182.     Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

183.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendant Enzymotec on behalf of members of the Class who purchased or otherwise acquired Enzymotec common stock pursuant and/or traceable to the IPO and SPO Offering Documents, and were damaged by acts alleged herein.

184.     By means of the IPO and SPO Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, Defendant Enzymotec, through public offerings, solicited and sold Enzymotec securities to members of the Class.

185.   The IPO and SPO Offering Documents materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

186.   Members of the Class purchased Enzymotec securities by means of the materially misstated IPO and SPO Offering Documents.   At the time they purchased shares in the Offerings, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the IPO and SPO Offering Documents, including the IPO and SPO Prospectuses.

187.   By virtue of the conduct alleged herein, Enzymotec violated Section 12(a)(2) of the Securities Act.

188.   Accordingly, members of the Class who purchased or otherwise acquired Enzymotec securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to Enzymotec.   Members of the Class who have sold their Enzymotec securities issued in or traceable to the Offerings are entitled to recissory damages.

189.   This claim is brought within one year after the discovery of the misstatements and omissions contained in the IPO and SPO Offering Documents and within three years after the Offerings.

## **COUNT V**

**For Violations Of Section 15 Of The Securities Act In Connection With The Offerings Against The Officer And Director Defendants**

190.   Lead Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

191.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Officer and Director Defendants, on behalf of members of the Class who purchased or otherwise acquired Enzymotec securities pursuant and/or traceable to the IPO and SPO Offering Documents and were damaged by acts alleged herein.  For the purposes of this Count, Lead Plaintiffs assert only strict liability and negligence claims and expressly disclaim any allegation of fraud or intentional misconduct.

192.    At all relevant times, the Officer and Director Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  As set forth herein, because of their positions in the Company and/or because of their positions on the Enzymotec Board, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

193.    Specifically, Defendants Katz and Bryan each served as an executive officer of Enzymotec.  As such, at all times relevant, these Defendants each participated in the operation and management of the Company, conducted and participated, directly and indirectly, in Enzymotec's business affairs and operations.  These Defendants also participated in the preparation and dissemination of the IPO and/or SPO Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offerings.  Because of their positions of control and authority as senior officers of Enzymotec, each of these Defendants was able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

194.    Similarly, the Director Defendants each served as Directors on Enzymotec's Board at the time the IPO and/or SPO were conducted and/or at the time that the IPO and/or SPO Registration Statements were signed.    As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Enzymotec's financial condition and results of operations.    These Defendants each signed the IPO and/or SPO Registration Statements and the documents which were incorporated by reference into the IPO and/or SPO Offering Documents; and/or were Directors at the time the IPO and/or the SPO were conducted, the IPO and/or SPO Offering Documents were disseminated to the investing public, and the IPO and/or SPO Registration Statements became effective.    Thus, these Defendants controlled the contents and dissemination of the IPO and/or SPO Offering Documents.

195.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Defendant Enzymotec, each of these Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Enzymotec securities pursuant to or traceable to the IPO and SPO Offering Documents.    As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XI.    CLASS ACTION ALLEGATIONS

196.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Enzymotec's common stock during the Class Period, September 27, 2013 through August 4,

2014, inclusive and were damaged thereby (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Enzymotec during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

197.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Enzymotec's common stock was actively traded on the NASDAQ, an efficient market.  As of June 30, 2014, Enzymotec had more than 21 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members in the Class.

198.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

(a)    Whether Defendants violated the federal securities laws;

(b)    Whether Defendants misrepresented material facts concerning Enzymotec;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

75

(e)     Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

(f)     Whether the Offering Documents contained material misstatements or omissions;

(g)     Whether the Enzymotec SEC filings issued during the Class Period which contained financial information (*i.e*., its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

(h)     Whether the prices of Enzymotec's common stock were artificially inflated; and

(i)     The extent of damage sustained by Class members and the appropriate measure of damages.

199.     The claims of Lead Plaintiffs are typical of those of the Class.

200.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

201.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XII.   PRAYER FOR RELIEF

202.     WHEREFORE, Lead Plaintiffs pray for relief and judgment, individually and on behalf of the Class, as follows:

(a)     Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' Counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIII.  **JURY DEMAND**

203.    Lead Plaintiffs demand a trial by jury for all issues so triable.


Dated: May 18, 2015                           Respectfully submitted,

                                              By: */s/ James E. Cecchi*

                                              James E. Cecchi
                                              Donald A. Ecklund
                                              CARELLA, BYRNE, CECCHI
                                              OLSTEIN, BRODY & AGNELLO, P.C.
                                              5 Becker Farm Road
                                              Roseland, New Jersey 07068
                                              (973) 994-1700

                                              Joseph E. White, III
                                              Lester R. Hooker
                                              Brandon T. Grzandziel
                                              SAXENA WHITE P.A.
                                              5200 Town Center Circle, Suite 601
                                              Boca Raton, Florida 33486
                                              (561) 394-3399

                                              Richard A. Maniskas
                                              Katharine Ryan
                                              RYAN & MANISKAS, LLP
                                              995 Old Eagle School Rd., St. 311
                                              Wayne, Pennsylvania 19087
                                               (484) 588-5516

                                              *Lead Counsel for Lead Plaintiffs*
                                              *and the Class*

## CERTIFICATE OF SERVICE

I certify that the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed via the Court's CM/ECF system and served on all counsel by operation of the Court's electronic filing system on May 18, 2015.


*/s/ James E. Cecchi*
JAMES E. CECCHI